THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JESSIE TRIPLETT, a/k/a Jessie Adams, Defendant-Appellant.

First District (4th Division)    No. 80-304

Opinion filed August 27, 1981.

Clarold L. Britton, William D. Heinz, and Ruben Castillo, all of Chicago (Jenner & Block, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Warren A. Zimmerman, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County the defendant was convicted of murder and armed robbery. He appeals contending (1) he was denied his right to a fair trial because the trial court erroneously admitted evidence of a prior crime; (2) he was denied a fair trial because of improper arguments made by the prosecutor during closing arguments; (3) the trial court erred in not permitting him to cross-examine a witness on the witness' criminal record in order to show bias, interest and motive to testify falsely; (4) the trial court erred in admitting the defendant's bank records into evidence; (5) he was not proved guilty beyond a reasonable doubt because the testimony of the State's two main witnesses was improbable, inconsistent and untrustworthy; and (6) the trial court erred in denying his motion for a new trial based upon newly discovered evidence.

The undisputed facts in this case are that sometime between 6:30 and 11 a.m. on September 18, 1978, Alexander Nimoh, the manager of a Clark Oil Company service station at 500 West Garfield Boulevard in Chicago, was murdered during a robbery at the station. Nimoh was shot three times in the head, and $1,373.88 in cash and property were taken from the station. After the robbery, money wrappers were found lying on the floor, and there were stacks of coins on a shelf.

On December 10, 1977, the defendant was hired to work at the Clark Oil Company gas station located at 710 North Milwaukee Avenue in Chicago. He also worked at the station at 500 West Garfield, but it is

unclear from the record exactly when he worked at that location. On February 2, 1978, the defendant's salary was raised and he was promoted to the position of manager of the Clark Oil Company gas station at 3357 West Harrison Street, Chicago. On May 18, 1978, the defendant was demoted from manager to attendant. Later that month he was fired. The defendant admitted that he was familiar with the gas stations' procedures and specifically with the bank deposit procedures. According to the testimony, he had himself been responsible for preparing deposits when he was a manager.

It is undisputed that on the day of the robbery, probably before noon, the defendant deposited $924 in his bank account. Just prior to the deposit made on September 18, the balance in the account was $5. Following the September 18 deposit there were withdrawals of $175 on September 21, $200 on September 22 and $50 on September 29. The remaining balance of $505.22 was withdrawn when the account was closed on October 2, 1978.

The State introduced evidence that the defendant had committed another robbery of a different Clark Oil Company gas station about three months prior to the commission of the crimes charged here. The State's proof concerning the prior offense will be detailed subsequently. Troy Whitmore and Mark Sanders were the State's principal witnesses. Whitmore was 11 years old at the time of the crime and 13 years old at the time of trial. He had worked with the defendant at the Clark station at 500 West Garfield Boulevard. At approximately 8 a.m. on September 18, 1978, Whitmore left his home in the Roseland neighborhood of Chicago. He traveled by public transportation to the gas station. At approximately 10 a.m., just after he arrived, Whitmore saw the defendant drive a green station wagon into the gas station. As Whitmore stood behind one of the station's gasoline pumps he saw the defendant get out of the car, walk to the passenger side, reach through the car window and remove a gun from a jacket which was hanging there. The defendant walked into the station with the gun at his side. Nimoh was standing with his back toward the outer door of the station office, facing the door to the back room of the office. The defendant put a gun to Nimoh's back. The defendant and Nimoh walked into the back room, a storeroom, and the defendant closed the door behind them. Because the door was closed Whitmore could not see what occurred but about two or three minutes later he heard a single gunshot. The defendant then exited the station office, carrying a shiny gun and the beige zippered pouch which was used at the station to make "bank drops."

While testifying Whitmore referred to the defendant as "Eddie" even though the defendant was not known by that name. This was because Whitmore knew a person who looked like the defendant and his name is

Eddie. According to Whitmore, the man he saw at the Clark Gas station on the morning of the crime was "the Eddie that's in court today."

Whitmore testified that it was not raining at 8 a.m. when he left his home or at anytime on the morning of the occurrence.

After witnessing the events testified to, Whitmore ran away from the station. He returned later that day and saw police officers there. He did not tell them what he had seen. He returned to the station the following day and again the police were there. The officers questioned Whitmore and told him that he knew about the murder. He denied having any information. According to Whitmore the officers told him that if he did not tell what he knew that he could go to jail. When asked whether he believed that he could go to jail if he did not tell the police what he knew, Whitmore answered affirmatively. He stated that he told the police officers the truth.

In an attempt to show bias, interest or motive to testify falsely, defense counsel sought to bring out during his cross-examination of Whitmore the fact that Whitmore was on probation and the fact that several juvenile petitions against him had been stricken with leave to reinstate. The court reviewed Whitmore's juvenile record and found that it was not a basis for bias as to which cross-examination is appropriate. Defense counsel was permitted to show that Whitmore did have previous contact with the police.

Mark Sanders testified that he had known the defendant for about two years and lived almost directly across the street from him. At approximately 5 p.m. on Saturday, September 16, 1978, the defendant came to Sanders' home and asked him to accompany the defendant to the gas station at 500 West Garfield, about six blocks from Sanders' home. The defendant wanted to "case" the station to determine when "the man" would be there by himself. Sanders testified that he refused and told the defendant that it was a stupid idea to commit a crime where the defendant was known. According to Sanders, the defendant then said that he was going to "check it out."

Sanders awoke at about 11:30 on September 18, the morning of the robbery. It had been raining that morning but the rain had stopped by the time he awoke. At exactly 1 p.m. the defendant came to Sanders' home. It was not raining but the defendant looked damp. He had blood splattered about eight inches up on the bottom of his beige pants and on his brown buck shoes. Sanders could tell by looking at the defendant that something had occurred, and he asked the defendant what he had been doing. The defendant answered that he "took off the thing I had been telling you about." The defendant then asked Sanders to keep a large, silver gun for him. He offered Sanders $40 or $50 from a brown paper bag which contained currency and coins. Sanders saw what looked like a lot of

money inside the bag. Some of it was banded with brown paper strips in 3/4-inch stacks. Sanders refused to keep the gun for the defendant.

The defendant told Sanders that he shot the manager of the gas station in the leg. Sanders did not learn until a week later that the manager had been killed during the robbery.

Chicago Police Department Investigator Richard Solita was among the witnesses called by the defendant. Solita testified that he visited the defendant's house in Chicago looking for the defendant. The defendant's mother did not know where he was but she suggested that Solita contact the defendant's best friend, Mark Sanders, to learn the defendant's whereabouts. Solita contacted Sanders who stated that he knew the defendant but that he had no knowledge of the crime and did not know where the defendant was.

Solita contacted Sanders again. Sanders said that he did not want to talk about the defendant because the defendant was crazy and would kill Sanders if he found out that he had talked to the police. After being assured that he would not be forced to testify in court against the defendant, Sanders gave a statement. He told Solita that the defendant had approached him and had asked him to participate in a robbery of the Clark Oil Company gas station at 500 West Garfield. Sanders did not tell Solita the time of this conversation. Sanders stated that the defendant also came to his house at about 8:30 a.m., on September 18, 1978 and told Sanders that the weather was perfect to "pull the stickup" because it was pouring rain. Sanders refused to participate in the robbery and the defendant left the house. The defendant returned to Sanders' house later that day with bloodstains on his pants and shoes. Solita did not know the exact time of the defendant's return but stated that the crime occurred at about 10 a.m. and Sanders said that the defendant returned right after he committed the crime. Upon returning the defendant told Sanders that he had robbed the gas station and killed the attendant.

Solita also identified a written statement given by Sanders on October 4, 1978. This was a day or two after Sanders made his oral statement to Solita. According to the written statement, the defendant came to Sanders' house the Saturday before the robbery at 5 p.m., in an effort to persuade Sanders to participate in the crime and again at 1 p.m., on the day of the robbery. There is no mention in the written statement of the defendant visiting Sanders' house at 8:30 a.m., on the day of the robbery.

We first consider the defendant's contention that he was denied his right to a fair trial because the trial court erroneously admitted evidence that he committed an armed robbery of another Clark station. According to this evidence, the defendant and another man approached the manager of the Clark Oil Company gas station located at 710 North Milwaukee

Avenue in Chicago on June 30, 1978, at approximately 9 a.m. The manager was preparing to make a bank deposit. The defendant asked for change to use the telephone. The manager, who had previously worked with the defendant, gave him change. The defendant went to use the telephone. One or two minutes later the defendant returned to the station and pointed a black gun at the manager. The defendant told him "this is a stickup." The manager told the defendant that he did not have a key to the safe. The defendant answered that he knew the manager had a key because he knew the manager had to go to the bank that day. After taking $1,182.93 from the station receipts and $80 from the manager's personal funds, the defendant left the station in a green Pontiac two-door sedan. The State argues that the evidence of the prior crime is relevant to show the defendant's knowledge of Clark station procedures and that further the crime was so similar to the one for which the defendant was being tried that it was relevant to show common design and *modus operandi*.

■■ Evidence of crimes other than the one for which the accused is being tried is not admissible to show the accused's propensity to commit a crime. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) However, such evidence is generally admissible if relevant for another purpose such as to show motive, intent, identity, absence of mistake or *modus operandi*. (*People v. McDonald*.) The range of purposes for which evidence of other crimes is admissible is almost infinite. (McCormick, Evidence §190, at 448 (2d ed. 1972); E. Cleary & M. Graham, Handbook of Illinois Evidence §404.5, at 135 (3d ed. 1979).) Further, the purposes are not mutually exclusive; evidence of another crime may fall within several of them. (McCormick, Evidence §190, at 448 (2d ed. 1972); E. Cleary & M. Graham, Handbook of Illinois Evidence §404.5, at 135 (3d ed. 1979).) However, the courts are stricter in applying the standards of relevancy when the purpose is to prove identity or the commission by the accused of the crime charged than when the evidence is offered to show knowledge, intent or other state of mind. McCormick, Evidence §190, at 452 (2d ed. 1972).

■■ Further, the problem of determining the admissibility of other crimes is essentially one of balancing, rather than of merely pigeon-holing. (McCormick, Evidence §190, at 453 (2d ed. 1972).) Even where it has substantial relevance for a permitted purpose, evidence of another crime should not be admitted if its probative value is outweighed by its prejudicial effect. (*People v. Butler* (1975), 31 Ill. App. 3d 78, 334 N.E.2d 448; and see *People v. Friedman* (1980), 79 Ill. 2d 341, 403 N.E.2d 229.) Moreover, the actual need for the evidence must be considered in light of other evidence available to the prosecution. (E. Cleary & M. Graham, Handbook of Illinois Evidence §404.5, at 136 (3d ed. 1979).) First, we are not persuaded by the State's contention that evidence of the prior robbery was admissible to show the defendant's knowledge of Clark station

procedures. The defendant's familiarity with station procedures was clearly and unrefutably established by other evidence. The defendant readily admitted his employment at Clark stations and his knowledge of bank deposit and other procedures used by the company. The State's evidence established that the defendant worked at at least three Clark stations, that he managed at least one of them, that he was familiar with the procedure for making bank deposits, and that he himself had prepared bank deposits in his capacity as manager. Therefore, the probative value of and need for the evidence of the prior crime on this issue was minimal, and we believe, outweighed by the prejudicial effect. We believe the effect here was to influence the jury against the defendant by making the jury aware that he had been guilty of criminal conduct. In such cases the danger is that the jury will conclude that the defendant is of bad character and therefore probably committed the crime charged. (See *People v. Cook* (1977), 53 Ill. App. 3d 997, 369 N.E.2d 246; *People v. Butler* (1975), 31 Ill. App. 3d 78, 334 N.E.2d 448.) The prosecutor here in fact argued to the jury according to such logic.

■■ Further, we conclude that regardless of whether the evidence of the prior crime could be "pigeon-holed" into another category such as common design or *modus operandi*, it is inadmissible in the context of this case. A prior crime may be admitted under the theory of *modus operandi* where the crimes are "so nearly identical in method as to earmark them as the handiwork of the accused." (*People v. Osborn* (1977), 53 Ill. App. 3d 312, 320, 368 N.E.2d 608, 615.) Evidence of a prior crime is also admissible to show that it and the crime charged are part of a larger continuing plan or scheme. (McCormick, Evidence §190, at 448 (2d ed. 1972).) The similarities here are that two Clark gas stations where the defendant had previously worked were robbed, by someone with a gun, in the morning, while the station's manager was preparing a bank deposit and that similar amounts of money were taken from both stations. The methods of committing the two crimes were dissimilar in that: the defendant first approached the manager of the first station on a pretext whereas during the second robbery the offender simply confronted the manager with a gun; the first offense involved two offenders whereas there was only one offender in the second offense; a black gun was used during the first robbery, a "shiny" gun in the second; a green two-door sedan was used during the first crime and a green station wagon in the second; and the two crimes were committed three months and several miles apart. Thus, the probative value of admitting evidence of the prior offense is lessened by the fact that the crimes were so dissimilar and because many of the similarities are common to robberies in general. Further we must strictly apply the standards of relevancy since the purported purpose of admitting the evidence is to prove that the defendant was the perpetrator of the crime charged. Given the dissimilar-

ities between the prior offense and the charged offense and the purpose for which evidence of the prior offense was admitted, we conclude that the prior offense had too little if any probative value in showing common scheme or *modus operandi* to outweigh the prejudicial nature of the evidence sought to be admitted.

We conclude that the matter must be reversed and remanded for a new trial. Because the defendant may be retried, we will briefly address the merits of those of his contentions which would remain at issue at a new trial.

First, certain comments made by the prosecutor during closing argument were improper and should not be repeated on retrial. The prosecutor told the jury that defense counsel's closing argument nauseated him, ridiculed the jury's intelligence, was demeaning, calculated and contrived, patronized and belittled the jury, belied common sense and was an attempt to instill fear in the jury. He insinuated that defense counsel was a liar and stated that defense counsel played with the jurors' minds. In making these comments the prosecutor far exceeded the bounds of proper conduct. See *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880 and *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402, which criticized such deliberate prosecutorial misconduct.

The defendant also contends that it was improper and unconstitutional for the trial court to restrict his cross-examination of Whitmore concerning Whitmore's juvenile record because Whitmore's record shows bias, interest and motive to testify falsely. His contention that he should have been permitted to show Whitmore's probationary status at the time of trial is no longer at issue since the probationary period has run. However, we must still consider his argument that he should have been permitted to show that several juvenile petitions against Whitmore had been stricken with leave to reinstate and to argue Whitmore's bias, interest, and motive to testify falsely on that basis.

■■ The trial court is vested with substantial discretion to determine both the manner and scope of cross-examination. (*People v. McCain* (1963), 29 Ill. 2d 132, 193 N.E.2d 784.) This rule applies even where the purpose of the cross-examination is to show a basis for bias, interest or motive to testify falsely. (See *People v. McCoy* (1979), 74 Ill. 2d 398, 385 N.E.2d 696.) Although it is true that a witness may be impeached by a showing of interest, bias, or motive to testify falsely, such evidence need not be admitted where it is remote or uncertain. *People v. Nowak* (1979), 76 Ill. App. 3d 472, 395 N.E.2d 28; *People v. Hanks* (1974), 17 Ill. App. 3d 633, 307 N.E.2d 638; and see *People v. Coles* (1979), 74 Ill. 2d 393, 385 N.E.2d 694.

■■ Petitions which have been stricken with leave to reinstate theoretically may be reinstated. However, we believe the trial court was within its

discretion in determining that the dismissed petitions were so remote as a basis for showing bias, interest and motive to testify falsely that cross-examination concerning those petitions should have been restricted.

The defendant next contends that the trial court erred in admitting his bank records into evidence. The parties stipulated that the State obtained the defendant's bank records pursuant to valid subpoenas served on February 9 and March 1, 1979. The defendant testified that when he was arrested on November 15, 1978, the police showed him a copy of his bank deposit slip for September 18, 1978. The bank involved is a national bank.

■■ Citing Illinois statutory and constitutional law and opinions from other jurisdictions construing State constitutions, the defendant contends that it is illegal for the State to obtain bank records from a national bank without court order. Here it is conceded that the State did obtain the records prior to trial pursuant to legal process. However, the defendant argues, without analysis or citation to authority, that if the State may not obtain bank records without a subpoena then records obtained pursuant to a subpoena are invalid if the State had access to the records prior to the time that the subpoenas were issued. He makes no argument that the eventual, legal disclosure of his bank records was tainted by the fact that the State might have had previous access to his records and in fact makes no argument that he was in any way prejudiced by the State having had pre-process possession. Accordingly we are not persuaded that the trial court erred in denying the defendant's motion to suppress.

The defendant also contends that the testimony of Whitmore and Sanders is so improbable, inconsistent and untrustworthy as to raise a reasonable doubt of his guilt. It is the defendant's theory that the crime occurred before Whitmore reached the scene and that Whitmore fabricated his testimony in order to curry favor with the police or because of fear of police retaliation. It is the defendant's theory that Sanders participated in or committed the crime and testified falsely to protect himself.

In support of his contention that Whitmore fabricated his testimony the defendant points out the following alleged inconsistencies and improbabilities in Whitmore's testimony: (1) Whitmore referred to the defendant as "Eddie" although he knew that was not the defendant's name and the defendant was not known by that name; (2) Whitmore testified that it was not raining at 8 a.m. when he left his home or at any time on the morning of the occurrence, but this is contradicted by Sanders' statement to police and testimony at trial which indicated it did rain on the morning of the crimes; (3) Whitmore testified that he heard a single gunshot, but it is undisputed that three shots were actually fired; (4) Whitmore testified that he saw the defendant close the door to the storeroom before he heard

a shot fired, but according to other evidence there was blood splattered on the outside of the storeroom door; and (5) Whitmore testified that the defendant drove to the gas station in a green station wagon but a defense witness testified that after the crime he drove to the gas station in a green station wagon and parked his wagon where Whitmore claimed the defendant had parked.

The defendant claims that Sanders was shown to be testifying falsely by the following: (1) Sanders testified at trial that he woke up at about 11:30 on the morning of the murder and that the defendant came to his house at approximately 1 p.m, but he gave a statement to the police that the defendant came to his home at 8:30 a.m. on the day of the murder and asked him to participate in the robbery, and that the defendant returned to his house right after the robbery; (2) at trial Sanders testified that after the robbery the defendant said he shot the gas station attendant in the leg and that Sanders did not learn that the man was killed until about a week later, but according to the statement he made to police the defendant told Sanders right after the robbery that he had killed the attendant; (3) according to the State's evidence the defendant made a bank deposit "probably before noon" whereas Sanders testified that at 1 p.m. the defendant had a bag containing a lot of money; and (4) Sanders' testimony that the defendant wanted to "case" the gas station is inconsistent with the defendant's familiarity with the station.

■■ The decision of the jury concerning the sufficiency of the evidence will be affirmed unless the reviewing court can find reasonable and well-founded doubt as to the defendant's guilt. (*People v. Taglia* (1979), 76 Ill. App. 3d 199, 392 N.E.2d 725.) It is for the trier of fact to determine the credibility of witnesses and the weight to be given their testimony, and where the evidence is conflicting a court of review will not substitute its judgment for that of the trier of fact. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) In our view, the alleged inconsistencies and improbabilities advanced by the defendant do not so thoroughly destroy the credibility of Sanders and Whitmore that a retrial would amount to double jeopardy. See *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.

For the foregoing reasons the defendant's conviction is reversed and the cause is remanded for a new trial.

Reversed and remanded.

JOHNSON, J., concurs.

Mr. JUSTICE LINN, dissenting:

I respectfully dissent from the majority's holding that the admission of evidence of a prior crime in the instant case was so prejudicial that a new trial is warranted. In my view, the trial court did not abuse its discretion in admitting the evidence to show common design or *modus operandi* and, even if there was an abuse of discretion, I do not believe a new trial is warranted because the record affirmatively shows that the alleged error was not prejudicial.

The majority correctly cites the principle of law set forth in *People v. Osborn* (1977), 53 Ill. App. 3d 312, 368 N.E.2d 608, that a prior crime is admissible under the theory of *modus operandi* where the crimes are so nearly identical in method as to earmark them as the handiwork of the accused. However, as *Osborn* makes clear, the law of Illinois does not require that both offenses be identical. (*People v. Osborn*; *cf. People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506.) Rather, "[t]he critical question is not identity of the two offenses but is whether a comparison of the acts as a whole in both offenses demonstrates a common design and the same *modus operandi.*" *People v. Osborn* (1977), 53 Ill. App. 3d 312, 323, 368 N.E.2d 608, 617.

While it is true that differences between the two offenses exist, the factual similarities between these two situations are so strong and persuasive that, as in *Osborn*, they are sufficient to make evidence of the earlier offense relevant as proof of the existence of a common design and *modus operandi*. Whether the gun was shiny or black, the getaway car was a green two-door sedan or green station wagon, the defendant's approach was a pretext or direct confrontation, are differences which, in my view, simply do not render the crimes so dissimilar that allowing the evidence of the prior crime was so prejudicial as to warrant a new trial. Although a second man participated with defendant in the earlier crime, both crimes were committed at places of defendant's former employment during a time when defendant admittedly knew bank deposits were routinely made.

Moreover, the record here affirmatively shows that the alleged error was not prejudicial, unlike the error in *People v. Stadtman* (1974), 59 Ill. 2d 229, 319 N.E.2d 813, and *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288. In *Stadtman*, defendant was charged with theft, burglary, and possession of marijuana. At the close of the State's case, the court directed a verdict for defendant on the marijuana charge. The State asked defendant's co-defendant if he had ever seen defendant smoke marijuana. The court, noting that this evidence did not show defendant's knowledge but his propensity for crime, reversed the theft conviction because the record did not affirmatively show that the error was not prejudicial. In

*Romero*, defendant was charged with burglary and theft. The State introduced evidence that subsequent to a home burglary, defendant traveled to burglarize a gun shop and was apprehended and charged with possession of burglary tools. The court found this evidence prejudicial, since the only evidence presented at trial which linked defendant to the subject burglary was a witness who testified he had seen defendant with the stolen property and heard him say he had taken it from a home.

In the instant case, I believe the evidence presented linking defendant to the crime demonstrates affirmatively that even if the admission of evidence of the prior crime was error, it was, nevertheless, not prejudicial. Sometime before noon on the day of the robbery, defendant deposited $924 in his bank account. Whitmore, who knew defendant having worked with him, testified that he saw defendant, armed with a gun, walk into the station. Whitmore then observed defendant place the gun at the victim's head and walk with the victim into the back room. Whitmore then heard a gunshot and saw defendant exit with his gun and the pouch used at the station to hold bank deposits. Sanders, defendant's friend, testified that two days prior to the day of the robbery, defendant asked him to "case" the station where the murder and robbery occurred. In the afternoon, on the day of the robbery, defendant came to Sanders' home. Sanders observed blood on defendant's shoes and pants. Defendant told Sanders he had done what he had planned to do and offered him money from a pouch to keep defendant's gun. Sanders saw "a lot" of money banded with strips. Defendant then told Sanders he had shot the manager of the station in the leg.

This evidence affirmatively demonstrates that if any error occurred by allowing into evidence testimony of the prior crime, the error was nonprejudicial since the evidence of defendant's guilt was overwhelming.

Accordingly, I find it necessary to dissent. I agree with the majority's result and reasoning reached on the other issues raised by defendant, and since there is to be a new trial, I adopt the majority's conclusions for the remaining claimed errors.