Docket No. 81393–Agenda 5–November 1997.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. STEVEN MANNING, Appellant.

 Filed April 16, 1998.

CHIEF JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Steven Manning, was convicted of first degree murder and armed robbery. Ill. Rev. Stat. 1989, ch. 38, pars. 9–1(a), 18–2(a). Defendant chose to have the trial judge determine his sentence. At a separate sentencing hearing, the trial judge found defendant to be eligible for the death penalty and further determined that there were no mitigating circumstances sufficient to preclude the imposition of that sentence.

Accordingly, the trial judge sentenced defendant to death on the murder conviction and to a concurrent 30-year prison term on the armed robbery conviction. The death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). We reverse defendant's convictions and remand for a new trial.

BACKGROUND

The State's evidence at trial was essentially as follows. On June 3, 1990, the body of the victim, Jimmy Pellegrino, was found floating in the Des Plaines River near the Lawrence Avenue Bridge in or near Chicago. The body's wrists and ankles were bound together with duct tape, the head was in a plastic bag and covered with a towel, and the entire body was wrapped in canvas.

An autopsy revealed that the victim died of a single gunshot wound to the back of the head. The bullet entered the middle of the back of the head and travelled left and slightly downward. There were no chemicals in the body that would accelerate decomposition. The victim had been dead for at least several days, and the body showed signs of prolonged submersion.

The victim's wife, Joyce Pellegrino, testified as follows. The victim worked as a truck driver for a trucking company. During this time, the victim was in business with defendant. Joyce believed that this business involved a large amount of money. In the last month before his death, the victim had told her that defendant had “ripped him off for a lot of money,” and that he was going to get his money back from defendant.

On the morning of May 14, 1990, the victim told his wife that he had errands to do, and that he was going to meet with defen­dant. The victim also told her “that if he turns up dead,” that she should contact a particular agent with the Federal Bureau of Investigation (FBI) and say that defendant killed him.

Ronald Tyrakowski, a long-time friend of the victim, testified as follows. Tyrakowski admitted that he was convicted of possession with intent to deliver cocaine and was serving a 10-year federal prison sentence. Further, that sentence was part of a plea bargain in which Tyrakowski agreed to cooperate with the federal government in any of its ongoing investigations.

In late 1989 and early 1990, Tyrakowski sold drugs. The victim operated a trucking business and sold drugs with Tyrakowski. The victim dealt in kilo amounts, which at that time cost between $20,000 and $25,000. Tyrakowski would lend the victim the money, and the victim would buy and resell the cocaine. The victim would then repay Tyrakowski with a bonus from the reve­nues received. The victim's main supplier was defendant, whom Tyrakowski had never met.

In the spring of 1990, Tyrakowski had given $25,000 to the victim, who in turn gave the money to defendant to buy co­caine. However, defendant never delivered the drugs on that deal. The victim covered Tyrakowski's loss from his own assets.

In early May 1990, Tyrakowski and the victim agreed on another drug transaction with defendant. They would buy two kilos of cocaine from defendant for $52,000. Defendant would also include a third kilo for free, to replace the kilo that he previously failed to deliver.

On the morning of May 14, 1990, Tyrakowski and the victim met at around 4700 S. Kedzie Avenue. There, Tyrakowski gave $31,000 to the victim, who already had $14,000 of his own money. Later that morning, a friend of Tyrakowski, Alan Casey, supplied the remaining $7,000 in south suburban Worth.

At about noon, Tyrakowski gave the money to the victim, who was waiting in his car. The victim put all of the money in a gym bag, in which Tyrakowski saw the money, clothes and towels, and a silver .357 revolver. Tyrakowski did not know the victim to have ever brought a gun to a drug deal. The victim said that he was going to meet defendant, and that the victim would tele­phone Tyrakowski in about an hour. Tyrakowski never saw the victim again. The victim did not call, and Tyrakowski could not reach the victim on his mobile phone. The next day, Tyrakowski called Joyce Pellegrino.

On May 18, Joyce Pellegrino report­ed her husband's disappearance to the Will County sheriff's police. She told police that this was the first time the victim had been missing or had avoided home for an extended time. She told Chicago Police Detective Louis Rabbit that she suspected that the business the victim had with defendant might have involved drugs. She knew that the victim had borrowed $25,000 for a drug deal. She also contacted the FBI as the victim had instructed.

On June 24, 1990, the victim's automobile was found on a city street. Police did not find any money in the unlocked car, nor did they discover fingerprints, fibers, or blood.

Thomas Dye, a police informant, testified as follows. Dye had a significant criminal history dating from 1978. Dye admitted that throughout his adult life he has had at least 10 felony convictions. At the time of trial, he and his girlfriend were in the Federal Witness Protection Program, and had been relocated outside of Chicago.

In June 1990, Dye was in Cook County jail serving a 14-year sentence for residential burglary. He was also await­ing trial on three felony cases of theft and robbery; he was subse­quently convicted of these charges and received a concurrent five-year sentence. During this time, Dye assisted the Illinois State Police in their investigation of jailguards who were bringing drugs into the jail. Dye was moved into another divi­sion of the jail with different guards.

On August 17, defendant was incarcerated based on an unrelated charge and was placed in Dye's division of the jail. A friendship devel­oped immedi­ately upon their meeting. They talked about “anything two guys could talk about under those circumstances,” but “[p]rimarily crime; crimes that we had done, crimes that we were aware of.” Soon thereafter they discussed the pending case for which each was jailed, and how each could help the other evade conviction. Defendant asked Dye if he could provide an alibi for defendant in a case pending in another jurisdiction. As payment, defendant would kill, or arrange to have killed, the main witness in the case against Dye.

During these conversations defendant twice told Dye that he had murdered the victim. In the first conversation, defendant stated that he and another had established the victim in the truck­ing business and that the victim had actually worked for them. The victim had caused problems for the busi­ness, so defendant killed him.

During the next several days, defendant admitted to Dye that the problem between him and the victim did not involve the trucking business, but actually involved drugs. Defendant stated that he had cheated the victim on a drug transaction by not supply­ing him with cocaine. Defendant decided to cheat the victim a second time. The victim “whined” to defendant about his failure to deliver the cocaine again, and threatened to turn defendant in to the police. Defendant told Dye that “nobody tells on him,” so he killed the victim.

Defendant told Dye that he shot the victim once in the back of the head with a .25-caliber semiautomatic pistol from a few feet away. He explained that he used a small caliber gun because a large caliber bullet could travel through a body so the target might survive the shot. However, a small caliber bullet, particularly one aimed at the back of the head, would bounce around inside the brain, ensuring death. Defendant also admitted that he wrapped the victim's body and dumped it in a river, explaining that such a disposal causes incriminating evidence to be more diffi­cult to trace. Defendant also claimed that he put chemicals on the victim's body to accelerate decomposition. Dye believed that defendant was not on drugs during these confessions, and defendant never told Dye that he was taking medication.

On August 22, 1990, Dye met with FBI Agent Gary Miller. Dye agreed to wear a body wire and record his conversations with defendant. On Friday August 24, Agents Miller and Robert Buchan wired Dye, who wore it during the weekend of August 24 through 26. The recording apparatus was taped high up on his inner thigh and the microphones were taped to his navel area. Once the recorder was turned on, it could not be stopped. Each tape ran for two hours.

The recording contained many conversations regarding defendant's and Dye's plan of mutual assistance in their pending cases. Dye testi­fied that during this weekend defen­dant made an incrimi­nat­ing state­ment regarding the Pellegrino murder. Defendant pinned Dye's left arm behind his back, pushed him towards the ground, and, gesturing with his hand as a gun, pointed at the back of Dye's head, and said, “it was the same thing” with the victim. Howev­er, this conversation, or even any reference to the victim, was not recorded. Rather, the tape contains a two-second inaudi­ble gap. Dye explained that the microphones were pressed against his body when he bent over.

On September 24, Dye again agreed to wear a wire. Dye asked defendant a question regarding killing the victim. Defen­dant became angry and said “F–k, yeah, I killed him.” Again, howev­er, this conversation was not recorded due to a recorder malfunc­tion.

On October 4, Detective Rabbit executed a search warrant for defendant's storage locker in his apartment building. The building's maintenance engineer, while repairing plumbing, saw bullets in defendant's locker, knew that defendant was in jail, and reported what he saw to the police. Detective Rabbit found, 
inter alia
, seven live .25-caliber bullets. Those bullets were subsequently tested with the bullet recovered from the victim. The tests revealed no association beyond the fact that they were all .25 caliber. Further, the bullet recovered from the victim and the bullets found in defendant's locker had significantly differ­ent metal composition. The bullet from the victim was never compared to a particular gun.

In December 1990, Dye testified before a federal grand jury regarding the Pellegrino murder. In May or June 1991, the Cook County State's Attorney and Dye's attorney formally agreed that if Dye cooperated with the State's Attorney, told the truth, and testified when asked, Dye's sentence would be reduced from 14 to 6 years. Dye's sentence was accordingly reduced in May or June 1992, and he was paroled in July 1992 and placed in the Federal Witness Protection Program.

In late 1991, Tyrakowski was arrested for his federal drug offense. As previously discussed, he was with the victim on the day that he disap­peared. However, Tyrakowski did not then go to the authori­ties because he had an outstanding indictment against him and he did not want to be arrested. In December 1991, Tyrakowski testified before the grand jury regarding this case.

On February 20, 1992, defendant was indicted on three counts of murder, 
i.e.
, intentional, knowing, and felony murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9–1(a)(1) through (a)(3)), and a fourth count of armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18–2(a)). Defendant was also indicted on a fifth count of concealment of homicidal death (Ill. Rev. Stat. 1989, ch. 38, par. 9–3.1(a)), on which the State entered a 
nolle prosequi
 prior to trial.

The defense case, as presented in the opening statement of defendant's trial counsel, was essentially that the State failed to prove defendant guilty of the charged offenses beyond a reasonable doubt. The defense also asserted that the true murderer was Gary Engle, who had ties to both defendant and the victim. The defense presented several witnesses in support of its theory. At the close of the evidence, the jury returned two general verdicts of guilty, one each for first degree murder and armed robbery.

Defendant waived a sentencing jury prior to trial and again after his conviction. The trial judge found the presence of a statutory aggravating factor: the murder was committed in the course of a felony, 
i.e.
, armed robbery. See Ill. Rev. Stat. 1989, ch. 38, par. 9–1(b). Thus, the trial judge concluded that defendant was eligible for the death penalty. At the close of the sentencing hearing, the trial judge found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The trial judge accordingly sentenced defendant to death on the first degree murder conviction. The trial judge also sentenced defendant to a concurrent 30-year prison term on the armed robbery conviction.

Defendant appeals. Additional pertinent facts will be discussed in the context of the issues raised on appeal.

DISCUSSION

Defendant contends (1) the trial court should have suppressed his incriminating statements to Dye; (2) the evidence was insufficient to prove him guilty beyond a reasonable doubt; (3) the trial court erroneously admit­ted into evidence the record­ings of himself and Dye, other-crimes evi­dence, and hearsay testi­mo­ny from the victim's wife. Defen­dant also con­tends (4) he received ineffec­tive assistance of counsel when trial counsel elicited hearsay testimony from the victim's wife, elicit­ed testimony that defen­dant was in­volved in another murder, failed to object to hearsay testi­mony from Tyrakowski, and failed to investigate and present mitigation evidence at the death penalty hearing. Defen­dant con­tends (5) his sen­tenc­ing jury waiver was not knowing intelli­gent and voluntary. Also, (6) defen­dant raises two constitu­tional challenges to the Illi­nois death penalty statute.

I. Suppression of Incriminating Statements

Defendant denies that he ever made incriminating statements to Dye regarding the Pellegrino murder. However, defendant alternatively contends that the trial court should have granted his motion to suppress them. See 
People v. Norfleet
, 29 Ill. 2d 287 (1963). Defendant raises two issues: (1) the statements were obtained without giving him the 
Miranda
 warnings (see 
Miranda v. Arizona
, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)), and (2) the statements were coerced in violation of the due process clause of the fourteenth amendment.

Miranda

Defendant argues that Dye was required to give him the 
Miranda
 warnings prior to speaking with him. In 
Miranda
, the United States Supreme Court “held that the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during `custodial interrogation' without a prior warning.” 
Illinois v. Perkins
, 496 U.S. 292, 296, 110 L. Ed. 2d 243, 250, 110 S. Ct. 2394, 2397 (1990).

The 
Perkins
 Court explained that the 
Miranda
 warnings were meant to preserve the fifth amendment privilege against self-incrimination during incommunicado interrogation of individuals in a police-dominated atmosphere. Courts view that atmosphere as generating inherently compelling pressures that work to undermine the individual's will to resist and to compel the person to speak where the person would not otherwise do so freely. 
Perkins
, 496 U.S. at 296, 110 L. Ed. 2d at 250, 110 S. Ct. at 2397.

However, 
Miranda
 is not implicated in conversations between suspects and undercover agents. The essential ingredients of a police-dominated atmosphere and compulsion are not present when a prisoner speaks freely to an undercover agent. Ploys to mislead a suspect or lull the suspect into a false sense of security–that do not rise to the level of compulsion or coercion to speak–are not within 
Miranda
's concerns. 
Perkins
, 496 U.S. at 296-97, 110 L. Ed. 2d at 251, 110 S. Ct. at 2397.

Defendant attempts to distinguish this case from 
Perkins
. Defendant argues that, unlike Perkins, defendant 
knew
 that Dye was an informant, “who, as a result, had control over [defendant's] fate.” Defendant “believed that he had to talk to Dye for his own survival, to remain in a relatively safe tier in the jail, to benefit from Dye's promised help, and to try to be on sufficiently good terms with Dye that Dye wouldn't inform on him.” Defendant argues that being placed with a known informant, who was assigned to gather incriminating information, where the informant and his handlers knew that the informant would likely elicit incriminat­ing responses from defendant, “was the functional equivalent of interrogation.”

We note the State's claim that defendant waived this issue for review. The State contends that defendant's motion to suppress did not include the foregoing allegations. However, our review of the record persuades us that defendant adequately preserved this issue for review.

Defendant's own testimony at the hearing on the motion to suppress belies his argument. True, defendant testified that he knew that Dye was an informant, and for that reason feared what Dye could cause to be done to him in jail. However, defendant also testified that he had been a police officer and was a convict, and that he had cooperated with the State's Attorney's office and informed for the FBI. Defendant characterized himself as “pretty seasoned to what goes on in law enforcement,” and “pretty well aware of jailhouse informants and how they operate.”

Defendant testified that he could have confronted Dye and told Dye to stay away from him, or he could have “played along and jerked [Dye] around.” Defendant chose the latter approach. The incriminating statements to Dye were “nothing but empty jailhouse bravado,” or “puffing.” Although defendant could have remained silent around Dye at any time, defendant instead chose to speak to Dye. Defendant thus voluntarily accepted the risk that Dye would reveal the statement; defendant spoke at his own peril. See 
Perkins
, 496 U.S. at 298, 110 L. Ed. 2d at 252, 110 S. Ct. at 2398; 
People v. Johnson
, 197 Ill. App. 3d 762, 765-66 (1990).

Voluntariness–Due Process Clause

Defendant also argues that his incriminating statements to Dye were involuntary in violation of the due process clause of the fourteenth amendment. Pursuant to the due process test, known as the “voluntariness requirement,” “ `certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned.' ” 
People v. Easley
, 148 Ill. 2d 281, 314 (1992), quoting 
Miller v. Fenton
, 474 U.S. 104, 109, 88 L. Ed. 2d 405, 410, 106 S. Ct. 445, 449 (1985); 
People v. Mays
, 176 Ill. App. 3d 1027, 1034 (1988).

In 
Colorado v. Connelly
, 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986), the United States Supreme Court discussed the constitutional voluntariness of a statement made under circumstances not requiring 
Miranda
 warnings. The Court held that coercive police activity is a necessary predicate to the finding that a statement is not “voluntary” within the meaning of the due process clause. While mental condition is relevant to an individual's susceptibility to police coercion, the mere examination of the declarant's state of mind can never conclude the due process inquiry. A voluntariness analysis under the due process clause must focus on the crucial element of police overreaching. 
Easley
, 148 Ill. 2d at 312-13; 
Mays
, 176 Ill. App. 3d at 1034-35 (both cases discussing 
Connelly
).

Thus, in the present case, the constitutional voluntariness of defendant's statements depends on the absence of police overreaching. Our inquiry is, therefore, confined to an analysis of Dye's conduct and whether that conduct was causally related to defendant's confession. We must decide whether, under the totality of the circumstances, Dye obtained defendant's statements in a manner that comports with due process. See 
Easley
, 148 Ill. 2d at 312.

The State has the burden of establishing the voluntariness of a defendant's confession by a preponderance of the evidence. Also, the trial court's findings on the question of the voluntariness of a confession will not be disturbed on review unless they are against the manifest weight of the evidence. 
People v. Redd
, 135 Ill. 2d 252, 292-93 (1990).

The trial judge found as follows. Dye did not physically or mentally coerce defendant. Dye did not make any material misrepresentation to defendant, except that Dye was an informant, which defendant already knew. Also, defendant was extremely intelli­gent, well-oriented, and experienced based on his former roles of police officer and informant. Our review of the record does not reveal any evidence that Dye ever threatened defendant or prom­ised him a benefit to obtain his incriminating statements. Also, the conversations between Dye and defendant were not lengthy, and defendant was always free to walk away from Dye, or at least stop talking to him.

For an incriminating statement to be involuntary under the due process clause, the threats, promises, misinformation and the like must emanate from the police. True, defendant testified that he feared what Dye could cause to be done to him in jail. However, the only reason to suppress a confession on federal constitutional grounds is coercion by a public officer. In this context, “[t]he Constitution has not yet been interpreted to protect people against themselves.” 
Johnson v. Trigg
, 28 F.3d 639, 642 (7th Cir. 1994). We cannot say that the trial court's findings were against the manifest weight of the evidence.

II. Sufficiency of the Evidence

Defendant next contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt. Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational fact finder could have found beyond a reasonable doubt the essential elements of the crime. A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. 
People v. Eyler
, 133 Ill. 2d 173, 191 (1989).

Defendant views the State's case as depending on the testimony of Dye, whom defendant characterizes as a “jailhouse infor­mant” and an “experienced liar.” Defendant argues that Dye's “uncorroborated testimony should never be the basis for any conviction. Jailhouse informants are motivated by the desire to help themselves and are notoriously dishonest and unreliable witnesses.” According to defendant, without Dye's testimony, the remainder of the State's case is testimony that the victim was going to meet defendant on the day the victim disappeared, and that the bullets found in defendant's storage locker were the same caliber of the fatal bullet, but had a different metal composition. Defendant argues that this evidence, taken as a whole, fails to prove him guilty beyond a reasonable doubt.

It is not the function of a reviewing court to retry a defendant when considering a challenge to the sufficiency of the evidence. Rather, it is the function of the jury to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. 
People v. Tye
, 141 Ill. 2d 1, 13 (1990). Specifically, it is quite established that the credibility of a government informant, as with any other witness, is a question for the jury. See, 
e.g.
, 
United States v. Trujillo
, 959 F.2d 1377, 1384-85 (7th Cir. 1992); 
United States v. Molinaro
, 877 F.2d 1341, 1347 (7th Cir. 1989); 
People v. Irby
, 237 Ill. App. 3d 38, 58-59 (1992).

The jury was aware of the factors that would allow it to adequately judge the credibility of Dye. Thus, we cannot substitute our judgment for that of the jury. See 
People v. Carter
, 168 Ill. App. 3d 237, 243-44 (1988). Regarding defendant's insinuation that someone else murdered the victim, we note that speculation that another person might have committed the offense does not necessarily raise a reasonable doubt of the guilt of the accused. 
People v. Herrett
, 137 Ill. 2d 195, 206 (1990).

We have reviewed the entire record in the light most favorable to the prosecution. We note that the evidence against defendant was not ample or overwhelming. However, we cannot say that the evidence was so improbable or unsatisfactory that no rational fact finder could have found defendant guilty beyond a reasonable doubt of first degree murder and armed robbery.

III. Erroneously Admitted Evidence

Defendant next raises several evidentiary issues. The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and its ruling may not be reversed absent a clear abuse of discretion. 
People v. Illgen
, 145 Ill. 2d 353, 364 (1991).

Tape Recordings

Defendant claims that the trial court erred by admit­ting into evidence the tape-recorded conversations between himself and Dye. Six hours of conversations between Dye and defendant were recorded and subsequently transcribed. The jurors were given excerpts from the transcripts and audio equipment. However, the jury did not hear the complete and unabridged record­ings. The record on appeal does not include either the unabridged recordings or a transcript. Rather, during Dye's testimony, the State ques­tioned Dye as to particular points in the recording, which the jury heard and read. The jury was instructed to consider only those portions of the excerpts to which they were directed.

Defendant notes that during those six hours, Dye testified that defendant twice confessed to murdering the victim. However, the record shows that inaudible gaps in the recording occur at the times when Dye testified that defendant confessed. Describing the recordings as incomplete, unreliable, and prejudicial, defendant contends that the recordings are inadmissible and the trial court abused its discretion in admitting them into evidence.

A partially inaudible sound recording is admissible unless the inaudible portions are so substantial as to render the recording untrustworthy as a whole. The admission of a recording that is partially inaudible, or that reproduces only part of a statement or conversation, is a matter within the trial court's discretion. 
People v. Dougherty
, 160 Ill. App. 3d 870, 876 (1987); accord 
United States v. Robinson
, 956 F.2d 1388, 1395 (7th Cir. 1992); 29A Am. Jur. 2d 
Evidence
 §1238 (1994).

In the present case, Dye testified that one inaudible gap was caused by his bending over at the waist, blocking the microphones, and the other was caused by a recorder malfunction. The trial court correctly held that the two inaudible gaps in the recording were relevant only to the weight of the evidence and not its admissibility. See 
Robinson
, 956 F.2d at 1395.

True, inaudible gaps in the recording occurred when Dye testified that defendant confessed. However, despite their significance, they remain only two inaudible gaps out of the total of what the jury heard. We cannot say that the two inaudible gaps challenged here are so substantial as to render the recordings untrustworthy as a whole.

Evidence of Other Crimes

Defendant next contends that the trial court abused its discretion by admitting into evidence the conversations between himself and Dye where they discussed how each could help the other evade conviction in their pending cases. Specifically, defendant asked Dye if he could provide an alibi for defendant in his case; in return, defendant would kill or arrange to have killed the main witness in Dye's case.

Prior to trial, defendant moved to preclude the introduction of this evidence. The State argued that the conversations were admissible: (1) to put defendant's confessions into context, 
i.e.
, to explain why defendant would confess to the Pellegrino murder to Dye; and (2) because the detailed nature of the plan of mutual assistance between defendant and Dye shows defendant's ability to reason and commu­ni­cate, refuting the defense theory that defen­dant was merely bragging while under the influence of psychotrop­ic drugs. The trial court ruled that the State would be preclud­ed from ques­tioning Dye about those conver­sations during his direct examina­tion; however, defendant's cross-exami­nation of Dye might cause the court to reconsider its ruling.

During his opening statement, defense counsel described defendant as a braggart who took psychotropic drugs. Prior to Dye's testimony, the State sought the admission of the conversations, arguing that the conversations were now necessary to rebut defense counsel's comments. The trial court ruled that the State could elicit the conversation.

The principles are quite established. Evidence of crimes for which a defendant is not on trial is inadmissible if relevant merely to establish the defendant's disposition or propensity to commit crime. 
People v. Thingvold
, 145 Ill. 2d 441, 452 (1991); 
Illgen
, 145 Ill. 2d at 364. Evidence of other crimes is objectionable not because it has little probative value, but rather because it has too much. 
People v. Lucas
, 151 Ill. 2d 461, 485 (1992). Such evidence overpersuades a jury, which might convict the defendant only because it feels that defendant is a bad person who deserves punishment. 
Thingvold
, 145 Ill. 2d at 441. The law distrusts the inference that because a person has commit­ted other crimes, he or she is more likely to have committed the current crime. “And so, as a matter of policy, where the testi­mony has no value beyond that inference, it is excluded.” 
People v. Lehman
, 5 Ill. 2d 337, 342 (1955).

However, evidence of the commission of other crimes committed by the defendant is admissible when such evidence is relevant to establish any material question other than the defendant's propensity to commit a crime. 
Thingvold
, 145 Ill. 2d at 452. When evidence of other crimes is offered, the trial judge must weigh its probative value against its prejudicial effect, and may exclude the evidence if its prejudicial effect substantially outweighs its probative value. 
Illgen
, 145 Ill. 2d at 365. We note that “[t]he erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for rever­sal.” 
People v. Lindgren
, 79 Ill. 2d 129, 140 (1980).

Although the recordings as a whole are not untrustworthy, we con­clude that the conversa­tions between defen­dant and Dye regarding their plan of mutual assis­tance are inad­missible. Their probative value is clearly outweighed by their prejudicial effect.

The State argued that the conversations were necessary to rebut remarks in defense counsel's opening statement that defendant was a braggart taking psychotropic drugs. The State argued that the detailed nature of the plan of mutual assistance shows defendant's ability to reason and communicate. The trial judge did not make any findings for the record as to the prejudicial effect of the challenged conversations.

We conclude that the challenged conversations have little probative value. Dye recorded 
six hours
 of conversations. Other conversations between defendant and Dye can show that defendant can reason and communicate. Other conversations can also establish their relationship, to explain why defendant would confess to Dye.

On the other hand, the challenged conversations are very prejudicial. As previously noted, the evidence in the State's case is minimally sufficient. The challenged conversations show that defendant is a bad person who has a propensity to commit crime. See, 
e.g.
, 
People v. Cage
, 34 Ill. 2d 530 (1966); 
People v. Radovick
, 275 Ill. App. 3d 809 (1995); 
People v. Triplett
, 99 Ill. App. 3d 1077 (1981). We hold that the trial court erred in admitting this highly prejudicial evidence. Further, based on the minimal sufficiency of the evidence, we cannot say that retrial without this evidence would produce the same result. Thus, we cannot deem the erroneous admission of this evidence to have been harmless. See 
People v. Moore
, 171 Ill. 2d 74, 98 (1996); 
People v. Parmly
, 117 Ill. 2d 386, 396 (1987).

Hearsay Testimony from the Victim's Wife

Defendant contends the trial court abused its discretion also by admitting into evidence the following hearsay statement from the victim's wife, Joyce Pellegrino:

“Jimmy had told me the last time I saw him that if he turns up dead, that I should go to the FBI a [
sic
] Agent Pecoraro and tell him Steve Manning killed him.”

Prior to trial, the court ruled that the State could elicit from Joyce Pellegrino only that the victim told her that he was going to meet defendant. However, the State could not elicit from her the victim's out-of-court statement that if he were killed she should tell the FBI that defendant killed him.

At trial, Pellegrino testified on direct examination only that the victim told her that he was going to meet defendant. On cross-examination, defense counsel asked her what she told Agent Pecoraro about her conversation with the victim. Throughout her cross-examination, she did not mention the victim's out-of-court statement. At a sidebar prior to its redirect exami­na­tion, the State argued that since defense counsel ques­tioned her regarding what she told the FBI, then the State could ask her exactly what the victim said. The trial court ruled that since the defense brought up the FBI agent, then the State could elicit the testimony.

On appeal, the State concedes that the victim's out-of-court statement was barred as prejudicial inadmissible hearsay. However, the State argues that defense counsel's cross-examination of the victim's wife “opened the door” to the previously barred evidence.

The State invokes the doctrine of “curative admissibility.” If 
A
 opens up an issue and 
B
 will be prejudiced unless 
B
 can introduce contradictory or explanatory evidence, then 
B
 will be permitted to introduce such evidence, even though it might otherwise be improper. 
People v. Lewis
, 52 Ill. App. 3d 477, 485 (1977); 
People v. Wilbert
, 15 Ill. App. 3d 974, 984-87 (1973); accord 1 R. Steigmann, Illinois Evidence Manual §4:04 (3d ed. 1995). Specifically, in a criminal case, where the door to a particular subject is opened by defense counsel on cross-examination, the State may, on redirect, question the witness to clarify or explain the matters brought out during, or to remove or correct unfavorable inferences left by, the previous cross-examination. 
People v. Thompkins
, 121 Ill. 2d 401, 444 (1988); 
Lewis
, 52 Ill. App. 3d at 485-86.

However, the doctrine of curative admissibility is not a panacea; it does not permit a party to introduce inadmissible evidence merely because the opponent brought out some evidence on the same subject. 
People v. Higgins
, 71 Ill. App. 3d 912, 931 (1979). The rule is merely protective and goes only as far as is necessary to shield a party from adverse inferences. 
Saputo v. Fatla
, 25 Ill. App. 3d 775, 783 (1975). Further:

“ `[T]he doctrine of curative admissibility *** is limited in scope and design to those situations where its invocation is deemed necessary to eradicate 
undue
 prejudicial inferences which might otherwise ensue from the introduction of the original evidence. The decision of whether to admit curative evidence lies within the sound judicial discretion of the trial judge.' (Emphasis in original.)” 
People v. Chambers
, 179 Ill. App. 3d 565, 581 (1989), quoting 
Higgins
, 71 Ill. App. 3d at 931.

The record shows that, at trial, neither the prosecution nor the trial court indicated how defense counsel's cross-examination of the victim's wife prejudiced the State. On appeal, the State now argues that defense counsel's cross-examination of the victim's wife left the jury with the misleading impression that she never told the FBI anything about defendant. Referring to defense counsel's opening statement, the State now argues that this cross-examination fits with the defense theory of the case: that defendant had nothing to do with the victim's murder; but rather it was committed by another; and, as proof, even the victim's wife does not implicate defendant.

After carefully reviewing the record, we conclude that the State was not unduly prejudiced by defense counsel's cross-examination of Joyce Pellegrino. Defense counsel's cross-examination of the victim's wife actually brought out much information about defendant and the victim–with the exception that the victim had named defendant as his murderer. Defense counsel's cross-examination did not mislead the jury any more than the trial judge's 
in limine
 order barring the hearsay statement. Thus, the State was not thereby unduly prejudiced. Therefore, defense counsel did not “open the door” to the victim's out-of-court statement and, accordingly, it remained inadmissible. See 
Chambers
, 179 Ill. App. 3d at 580-82.

We note, 
sua sponte
, that under the “completeness doctrine,” which provides that where a witness relates a conversation the opponent may bring out all of the conversation on cross-examination (
People v. Weaver
, 92 Ill. 2d 545, 556 (1982)), prejudice is nonetheless required. 
People v. Olinger
, 112 Ill. 2d 324, 337 (1986). We hold that the trial court erred in admitting this prejudicial evidence. Further, as with the evidence of other crimes, we cannot deem the erroneous admission of this evidence to have been harmless.

Based on the erroneous admission of other-crimes evi­dence and the hearsay testimony of the victim's wife, defendant's convic­tion must be re­versed and the cause remand­ed for a new trial. We note our previ­ous finding that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt. We adhere to that finding even with the above-mentioned evidence excluded. This finding removes the risk of subjecting defendant to double jeopardy. See 
People v. Taylor
, 76 Ill. 2d 289, 309-10 (1979). Due to our disposition of this cause, we need not address defendant's remain­ing conten­tions.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed, and the cause is remanded to that court for a new trial consistent with this opinion.

Reversed and remanded
.

JUSTICE HEIPLE, concurring in part and dissenting in part:

The majority excludes evidence of a murder scheme between defendant and jailhouse informant Thomas Dye, whereby defendant would kill a witness in Dye's case in exchange for an alibi in his own. The majority holds that this evidence is more prejudicial than probative. I disagree. Evidence is excluded only if its prejudicial effect 
substantially
 outweighs its probative value. 
People v. Illgen
, 145 Ill. 2d 353, 365 (1991). The prejudicial effect of the evidence of the plan did 
not
 substantially outweigh its probative value; in fact, this evidence is highly probative. The conversation involving the scheme was admitted at trial to place defendant's confession in context and to rebut defendant's contention that he was unable to reason and communicate coherently because of medication he was taking. The conspiracy between defendant and Dye is highly probative in establishing these two points, and although other conversations between defendant and the informant were admitted, none were as probative as the ones in which defendant and Dye formed their plan. First, no other exchange explains 
why
 defendant confessed to Dye: it was to assuage Dye's doubts that defendant was capable of performing his promise to murder the witness in Dye's case. Without this information, defendant's reason for confessing, and thus the confession itself, remains mysterious and suspect. Second, this evidence was crucial to rebut defendant's argument that his reasoning was altered by medication taken while in prison. Even though several hours of other conversations between defendant and Dye were admitted, no other discussions so fully establish that defendant was coherent and able to reason as the ones where defendant and Dye concocted their detailed scheme. This evidence demonstrates that defendant's conversation was not merely drug-induced bravado; rather, it was careful, calculated and indicative of someone unaffected by medication. 

The admissibility of evidence at trial is a matter within the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. 
Illgen
, 145 Ill. 2d at 364. Such abuse of discretion will be found only where the trial court's decision was arbitrary, fanciful, or one that no reasonable person would make. 
Illgen
, 145 Ill. 2d at 364. That standard has not been met here, as it is clear that a reasonable person could find the disputed evidence more probative than prejudicial. The trial court did not abuse its discretion when it admitted the evidence, and the evidence should not be excluded now.

I agree, however, that the evidence concerning the hearsay testimony of the victim's wife should be excluded, and that to allow such evidence was not harmless error. Therefore, defendant should be granted a new trial, but at this new trial evidence regarding his conspiracy with Dye should be once again be admitted.

JUSTICES MILLER and McMORROW join in this partial concurrence and partial dissent.