2023 IL App (1st) 220496-U

FOURTH DIVISION
Order filed: June 22, 2023

No. 1-22-0496

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 9177 |
| | ) | |
| ONTARIO HOUSE, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Justices Rochford and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    In a domestic-violence prosecution, the circuit court did not err in allowing the State to present evidence of uncharged domestic violence offenses when that evidence was relevant to show the defendant's motive and to provide context, and any error in the court's failure to instruct the jury on the limited use of that evidence was harmless when the evidence of guilt was not closely balanced.

¶ 2    The defendant, Ontario House, appeals his convictions for aggravated stalking, stalking, and violating of an order of protection, all concerning the defendant's conduct towards his on-

again-off-again girlfriend. The defendant contends that the circuit court erred in allowing the State to present an excessive amount of other-crimes evidence and in failing to instruct the jury on how to evaluate and use the other-crimes evidence. The defendant also asserts that pandemic-related delays violated his right to speedy trial. We see no reversible error in any of these issues and affirm the defendant's convictions.

¶ 3    On July 12, 2021, the defendant was charged in a four-count indictment with one count of aggravated stalking and one count of stalking, each relating to a course of conduct occurring over July 7, 2020, May 5, 2021, and May 13, 2021, and two counts of violating an order of protection, one occurring on May 5 and one on May 13, 2021.

¶ 4    In November 2021, the State filed a motion seeking to admit evidence of other crimes, specifically evidence of uncharged threats and assaults of the victim in the case, the defendant's sometime-girlfriend Avylon Guynes, as well as threats, assaults, and violations of protection orders involving the defendant's previous girlfriend and her mother. The State argued that the evidence was admissible as evidence of a continuing narrative, as proof of motive, intent, and absence of mistake or accident, and as evidence of other crimes involving the same victim, as allowed by section 115-20 of the Code of Criminal Procedure ("Code") (725 ILCS 5/115-20 (West 2020)). In a hearing on the motion, the State further argued that the other-crimes evidence involving Guynes would "give the jury the best picture of the relationship between the defendant and the victim." As for the evidence of other crimes involving the other women, the State contended that it would "show the defendant's intent and motive towards people that he shares a dating relationship with," "might obviate any potential thought in the trier of fact's mind that perhaps all of this was a mistake or some sort of accident," and "show the trier of fact that the defendant had knowledge and intent,

specifically that he is aware of orders of protection" and how they work. The defendant opposed the State's motion, arguing that the other-crimes evidence was either too remote to be relevant, too dissimilar to the charged conduct, or unduly prejudicial.

¶ 5    The court allowed the State to present all but one piece of the proposed other-crimes evidence. The court found that, under the analysis required by section 115-7.4, which specifically pertains to evidence of uncharged acts of domestic violence, the past incidents involving the defendant and Guynes were more probative than prejudicial due to their proximity in time and similarity to the charged conduct, and the court explained that due to the degree of factual similarity the State could present evidence concerning all but one of the incidents involving the other women.

¶ 6    When trial commenced, Avylon Guynes was the first to testify. She explained that she and the defendant had dated on and off for eleven years, dating back to 2010. According to Guynes, on June 1, 2017, the defendant got into an altercation with Guynes' son. Guynes asked the defendant to get his things and leave, and as the defendant walked past Guynes' son, the defendant whispered something, which "sent [Guynes'] son off," and the defendant and Guynes' son wound up fighting in the street. The defendant was arrested as a result of the altercation.

¶ 7    Following his release from jail, the defendant and Guynes resumed their relationship. On May 13, 2019, Guynes found the defendant talking to another woman in the basement of her house. Guynes told the defendant to get out of her house, and she slammed the door in the defendant's face. The door hit the defendant in the forehead, and the defendant then pushed the door back open, hitting Guynes in the ankle with the door. Guynes turned around and took a swing at the defendant, who pushed Guynes across the kitchen counter. Guynes and her daughter then picked up chairs

and threw them at the defendant to get him to leave. Guynes reported that her ankle was swollen, "like a sprain," and that it caused her to limp. After the defendant had departed, Guynes called the police.

¶ 8     Officer Vasquez, who did not provide his first name, testified that, when he responded to Guynes' house on May 13, he spoke with Guynes and observed that she had a noticeable limp and was having a hard time walking. Vasquez also saw that Guynes' ankle was red, swollen, and had an abrasion. Footage from Vasquez's body camera showing Guynes' limp was played for the jury. Guynes told Vasquez that she had been involved in an incident with the defendant, and Vasquez and his partner then began searching the area for him. When they found someone matching the defendant's description, Vasquez and his partner drove the man back to Guynes' house, where Guynes identified the man as the defendant. Vasquez ultimately arrested the defendant on misdemeanor charges.

¶ 9     Following that incident, on May 29, 2019, Guynes obtained an order of protection against the defendant. The defendant was present in court when the order was issued. The order forbade the defendant from seeing or contacting Guynes, Guynes' children, or Guynes' father, and from visiting Guynes' home, place of employment, and car.

¶ 10    Despite the protection order, the defendant began calling Guynes "soon" after the order was entered. Although the phone number that the defendant used was a blocked number, Guynes recognized the voice on the phone to be that of the defendant. Guynes testified that the calls became "threatening" and that the defendant told her that she and her son had messed up his life and that "he was going to get [her] back for it." According to Guynes, the order of protection was still in place when the defendant made these phone calls.

¶ 11    On May 19, 2020, the defendant appeared at Guynes' place of work. Guynes was in her vehicle about to leave when the defendant used his car to block her car from leaving. The defendant came to the driver's side window and asked Guynes to speak with him, but Guynes refused. Guynes told the defendant that she was going to call the police. The defendant moved his car to allow Guynes to leave, and he proceeded to follow her back to her house. During the drive, while Guynes was stopped at a light, the defendant got out and again approached her window, asking to talk. Guynes again refused. When they arrived at Guynes' home, the defendant called Guynes "ghetto and a stupid B" and told her that he was "going to go eff with [her] mother." The defendant then left. Guynes attempted to follow him but eventually lost sight of him. Guynes testified that the protection order was in effect at the time of this incident, and she reported the events to police but could not recall if she pressed charges.

¶ 12    Two months later, on July 7, 2020, the first of the three dates listed in the State's indictment, the defendant again came to Guynes' workplace. Guynes was in her office and saw on surveillance video that the defendant was ringing the doorbell. Guynes' supervisor spoke to the defendant through the door, and Guynes described the defendant's behavior as "belligerent." Guynes came downstairs to an area just inside the front door, where she heard the defendant tell her supervisor "I know she's in there." The defendant finally left after Guynes' supervisor threatened to call the police. As with the previous incidents, the order of protection was still in place at the time of this episode.

¶ 13    Over the next few months, the defendant had very little contact with Guynes. According to Guynes, the defendant would occasionally call her and act nice and apologize. However, in September 2020, the nature of the calls changed. The defendant began threatening her and acting

disrespectfully. Recordings of five voicemails that the defendant left on Guynes' phone were played for the jury, but they were not transcribed in the trial transcript.

¶ 14    The defendant and Guynes resumed their relationship in October 2020 because the defendant said that he was sorry and Guynes said that she "wanted to love him." That lasted until February 2021, when they broke up again. On April 5, 2021, the defendant came to Guynes' house. During that visit, he argued with Guynes and kicked her door several times.

¶ 15    Shortly thereafter, Guynes informed the defendant that she was pregnant. On May 5, 2021, the second of the three dates listed in the State's indictment, with the order of protection still active, the defendant again came to Guynes' house and started an argument with Guynes and Guynes' father, Lionel Merritt. After she and the defendant "had words," Guynes slammed the door in the defendant's face. The defendant then banged on the door and Merritt answered and argued with the defendant, with Guynes right behind him. During that argument, the defendant stated that he "didn't want a baby by [Guynes]," that "[Guynes] wasn't going to have this baby," and that "he was going to beat [Guynes'] baby out of [her]." Guynes testified that the defendant's conduct made her feel mad and hurt.

¶ 16    About one week later, on May 13, 2021, the last of the three dates at issue in the indictment, the defendant asked to speak with Guynes, and Guynes agreed to meet the defendant at the Dan Ryan Woods. The two had a conversation in the defendant's car during which Guynes told the defendant that he could be in the baby's life but not hers. After that, "things got physical." Guynes got out of the car and started to walk home. The defendant followed her and tried to apologize, but Guynes did not want to hear it. The defendant got out of his car, grabbed Guynes, and tried to force her into his vehicle. Guynes refused and continued walking home. The defendant followed Guynes

and yelled at her from the window of his car. Eventually, as Guynes was walking in front of a Baskin Robbins, the defendant got out of his car and started throwing rocks at her, none of which made contact. The defendant told Guynes that he was going to "whoop [her son's] butt." Guynes reported the incident to police.

¶ 17    On May 31, 2021, the defendant again came to Guynes' house and asked Guynes to go to Walmart with him. When Guynes refused, the defendant went to his car, retrieved a baton, and used it to hit Guynes' front door and to break the windows on Guynes' car. A video of the incident was played for the jury, and photos of the damage were published and admitted into evidence.

¶ 18    In early June 2021, the defendant was arrested. From that point on, he called Guynes from jail numerous times, and as often as five times a day. Sometimes the defendant would call Guynes directly from his phone account, sometimes he would call on other people's accounts, and sometimes he would call through three-way calls initiated by other people. During these calls, the defendant asked Guynes to forgive him and promised to try to do better. He also asked Guynes to drop the charges against him. Recordings of eighteen voicemail messages left by the defendant on Guynes' phone were played for the jury. As before, they were not transcribed for the trial transcript. Guynes testified that when the defendant placed these calls the order of protection was still in effect.

¶ 19    Cook County Department of Corrections investigator Kimberly Hofsteadter testified about the defendant's jail calls. Hofsteadter explained that the Cook County Jail has a system that records all inmate phone calls and prepares a "call detail report" that documents information such as the name of the inmate, the number that the inmate called, and the duration of the call. Inmates are informed at the beginning of each call that they are being recorded. According to Hofsteadter, the

defendant and other inmates made 119 calls from the jail to Guynes' phone number between September 1 and November 25, 2021. The State played recordings of three more calls for the jury, which were not transcribed for the record.

¶ 20    Rosetta Stokes, the grandmother of the defendant's former girlfriend, Arteria Mixon, testified that, in 2008 or 2009, Mixon was in a relationship with the defendant. At some point during that relationship, Mixon obtained an order of protection against the defendant, forbidding the defendant from having contact with her or Stokes. On May 31, 2009, while the protection order was in place, Stokes received a threatening phone call from the defendant. According to Stokes, the defendant threatened to kill her and Mixon. Soon thereafter, Stokes saw the defendant in the back alley behind her house, "cursing and carrying on like he usually do." At some point, the defendant threw a rock at the house and broke a window. As a result of this conduct, the defendant was arrested.

¶ 21    After the State rested its case, the defendant did not testify and did not present any evidence.

¶ 22    Earlier in the trial, following the conclusion of the first day of testimony, the parties and the court held an informal jury-instructions conference, which was held off the record. At the conclusion of the second and last day of testimony, they held a formal instructions conference on the record, during which the court and defense counsel had the following exchange regarding Illinois Pattern Jury Instruction (IPI) 3.14, "Proof Of Other Offenses Or Conduct":

"THE COURT: *** Let me interrupt myself for a minute. Did the Defense when we had the informal instructions conference outside – or off the record last Friday, did you want to give IPI 3.14?

COUNSEL: We're not going to ask for it.

THE COURT: Did you wish for any other instruction to be given?

COUNSEL: No, Judge."

Thus, the defendant did not raise any objection to the jury instructions.

¶ 23    Regarding the verdict form, however, the defendant pointed out to the court that the two counts relating to violations of an order of protection were distinguished by dates, with one stating that it concerned May 5, 2021, and the other concerning May 13, 2021. The defendant requested that the stalking and aggravated stalking offenses likewise be distinguished by dates and that the dates applicable to each count be included on the verdict form. Following an objection by the State, the court denied the defendant's request. The court reasoned that the dates for those counts were not necessary because in order to prove that the defendant committed stalking and aggravated stalking the State needed to prove a "course of conduct," not necessarily that any particular event occurred on any particular day. According to the court, that contrasted with the counts for violating an order of protection, which concern singular acts alleged to have taking place on particular dates.

¶ 24    After receiving its instructions from the court, the jury deliberated. During its deliberation, the jury sent out three notes. The first two came ten minutes apart, with the first of those asking, "What is the date range (or specific dates) for a stalking charge or is there none?" In response to this question, the State argued that the court should provide no additional instruction, while the defendant argued that, as he previously requested during the jury-instructions conference, the court should specify which dates apply to the stalking and aggravated stalking charges. The court again rejected the defense's position, reiterating its belief that the stalking offenses did not depend on the conduct having occurred on any particular day.

¶ 25    The second question asked "If both parties meet at a mutual location, [does that constitute] a violation of a protection order? *Mutual location, not her residence or work." The State requested that the court instruct the jury that the consent of the protected party is legally irrelevant, and the defense opposed any further instruction, believing that would confuse the issues. The court sided with the defense and declined further instruction. Accordingly, the court did not provide any further instruction to the jury and responded, "With respect to both questions, you've been instructed on the law, continue your deliberations."

¶ 26    The third question asked if the jury could see a transcript of Guynes' testimony, but before the parties and the court could convene to answer the question, the jury reached a verdict. The jury found the defendant guilty as charged on all four counts.

¶ 27    Less than 30 days later, the defendant filed a motion for new trial, which he supplemented on March 14, 2022. In the supplement, in relevant part, the defendant argued that the circuit court erred in granting the State's motion to present other-crimes evidence, in not permitting the offense dates to be included in the jury instructions on the aggravated stalking and stalking charges, and in not providing the jury with IPI 3.14 on the use of other-crimes evidence. Regarding IPI 3.14, the defendant asserted that, "[i]nitially, the defense moved for IPI No. 3.14 and then withdrew it once the option became either not give the instruction or give a non-IPI modified version." Further, the defendant contended that, when the jury asked about the date range for the stalking charge, the court should have given IPI 3.14 to help the jury distinguish between charged and uncharged conduct. Overall, the defendant argued that the cumulative effect of these and other errors denied him a fair trial.

¶ 28    When the parties appeared for sentencing, the court first considered the defendant's motion for new trial. Following argument from both parties, the court denied the motion. That same day, the court sentenced the defendant to five years in prison on count one, aggravated stalking, with counts two, three, and four merging into count one. This appeal follows.

¶ 29    The defendant raises what we view as three arguments in this appeal. First, he asserts that the circuit court erred in allowing the State to present the evidence of uncharged other crimes. Second, he argues that the court erred in not clarifying how the jury was to use that other-crimes evidence by providing the jury with IPI 3.14 and by providing the applicable dates for the stalking offenses. Lastly, he argues that pandemic-related delays violated his right to speedy trial. We see no merit to any of these arguments.

¶ 30    The defendant first contests the circuit court's decision to allow the State to present evidence concerning uncharged crimes. Specifically, he argues that the court erred in allowing the State to present such a "large volume" of other-crimes evidence, which, the defendant contends, more than doubled the amount of evidence relating to the charged offenses. According to the defendant, "doing so completely blurred the lines as to what conduct [the defendant] was on trial for allegedly committing and resulted in the reasonable possibility that the jury convicted him because he was a bad person who deserved punishment."

¶ 31    "Evidence regarding other crimes is generally inadmissible to demonstrate propensity to commit the charged crime (propensity). Such evidence is not considered irrelevant; instead, it is objectionable because such evidence has 'too much' probative value." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) (quoting *People v. Manning*, 182 Ill. 2d 193, 213 (1998)). This prohibition on the admission of other-crimes evidence is to "protect against the jury convicting a defendant

because he or she is a bad person deserving punishment." *Id.* (citing *Manning*, 182 Ill. 2d at 213–14). However, for cases involving domestic violence, section 115-7.4 of the Code has abrogated this common law prohibition against the use of other-crimes evidence to show propensity and "permits the trial court to allow admission of evidence of other crimes of domestic violence to establish the propensity of a defendant to commit a crime of domestic violence," provided that certain requirements are met. *People v. Dabbs*, 239 Ill. 2d 277, 295 (2010).

¶ 32     Those specific requirements are set out in the statute, which states that, when a defendant is accused of an act of domestic violence, "evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant." The statute further provides:

"(b) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances." 725 ILCS 5/115-7.4 (West 2020).

" 'Undue prejudice' within the meaning of section 115-7.4(b) necessarily is prejudice other than that resulting from proof of the defendant's propensity to commit domestic violence, because the very purpose of section 115-7.4 is to lift the common-law ban on that particular kind of propensity evidence." *People v. Kelley*, 2019 IL App (4th) 160598, ¶ 77. A trial court's decision to admit other-crimes evidence is reviewed for an abuse of discretion. *Donoho*, 204 Ill. 2d at 182.

¶ 33     The defendant contends that the State's presentation of more than twice as much other-crimes evidence as evidence relating to the charged offenses was "excessive" and denied him a

fair trial. It is true that "a large volume may make probative other-crimes evidence overly prejudicial." *People v. Cardamone*, 381 Ill. App. 3d 462, 496 (2008). And on a few occasions courts have reversed convictions when other-crimes evidence was deemed excessive. See, *e.g.*, *Cardamone*, 381 Ill. App. at 491 (holding that other-crimes evidence was excessive when it comprised the "vast majority" of the State's case and outnumbered the twenty-six charged acts by hundreds); *People v. Brown*, 319 Ill. App. 3d 89, 97 (2001) (concluding that the State improperly "switched the focus of the trial" to the defendant's uncharged acts when six of the State's twelve witnesses testified about the uncharged acts).

¶ 34     But those appear to be extreme cases, and the analysis does not involve simply comparing the volume of other-crimes evidence to the number of charged offenses. Indeed, the analysis is more nuanced than that, and in other cases our courts have found no error when the other-crimes evidence outnumbered the evidence of the charged offenses. We find one such case particularly instructive.

¶ 35     In *People v. Perez*, 2012 IL App (2d) 10086, ¶¶ 4, 40, the defendant was convicted of two counts of aggravated criminal sexual abuse. During trial, the State presented evidence of dozens of uncharged acts of inappropriate sexual contact that the defendant perpetrated against both the victim and another minor. Although the number of uncharged acts testified to significantly outnumbered the charged acts, our court held that, "[w]hile the quantity of other-crimes evidence did exceed that of the charged conduct, it certainly did not rise to the extreme volume reflected in *Cardamone* and it otherwise reflected relevant propensity evidence under section 115-7.3 [the substantively similar sexual-offenses counterpart to section 115-7.4]." *Id.* ¶ 50. The court believed that the other-crimes evidence provided necessary context, explaining that "context is relevant and,

without context, limiting a complainant's testimony might make the charged incidents appear isolated and unfairly strain the credibility of the complainant's testimony concerning the charged offenses." *Id.* It was also noteworthy that the alleged victim of the uncharged acts did not testify at length about those acts but rather testified "summarily" and in a manner that was "not unduly inflammatory or excessive." *Id.* ¶ 52. The court also distinguished *Cardamone* on the basis that *Cardamone* was a complex case with over 100 witnesses, which had the effect of confusing what conduct was at issue, while in *Perez* "there were significantly fewer witnesses, the issues were not complex, and the volume of other-crimes evidence, while greater than that pertaining to the charges, was not excessive." *Id.* ¶ 54.

¶ 36    We find the present case to be more similar to *Perez* than *Cardamone*. Here, like in *Perez*, we have a relatively simple case with few witnesses. Further, the testimony about the defendant's uncharged conduct was not particularly emotional or inflammatory; it would be fair to characterize it as "summarily" recounting the defendant's actions. And, most importantly, the other-crimes evidence was factually similar, probative of the defendant's motive, and necessary to provide context for the charged conduct. Indeed, if the testimony had been limited to the three dates at issue in the indictment, the jury would not have heard about the circumstances that caused Guynes to obtain the order of protection, and the other-crimes evidence provided context regarding the on-again-off-again nature of the parties' relationship, which helped illuminate the motive behind the defendant's actions. As was the case in *Perez*, providing evidence regarding the charged conduct alone would have made the defendant's actions appear isolated, thereby making Guynes' testimony regarding the charged conduct somewhat less credible. While this evidence of uncharged conduct was certainly prejudicial to the defendant, it was not unduly so, especially

given that section 115-7.4 was intended to abrogate the common-law rule against the use of other-crimes evidence to show propensity in cases of domestic violence. Accordingly, the circuit court did not abuse its discretion in allowing the State to present evidence of uncharged crimes.

¶ 37    The defendant next asserts that the circuit court erred in not instructing the jury how to use the other-crimes evidence. Specifically, he argues that the court should have given IPI 3.14, which explains to a jury that it may only use other-crimes evidence for the limited purpose for which it was admitted (*e.g.*, identification, intent, motive), either before the jury began deliberations or in response to its question regarding the applicable dates for the stalking offenses. He also contends that the court should have provided the jury with the dates that it requested. The defendant argues that the cumulative effect of these errors denied him a fair trial.

¶ 38    The State responds that, as an initial matter, there is no record of the defendant having requested IPI 3.14. And indeed, the only discussion of that instruction on the record consists of the court asking the defendant, "did you want to give IPI 3.14?," to which defense counsel responded, "We're not going to ask for it." When the court then asked, "Did you wish for any other instruction to be given?," defense counsel simply stated, "No, Judge." The defendant maintains that he requested IPI 3.14 during the off-the-record, informal instructions conference held earlier in the trial, but we have no other record of what was said during that conference. We do not know what arguments each side made, and we do not know why the court, according to the defendant, gave the defendant the option of a modified version of the instruction or none at all. All we are able to tell from the record is that during trial the court asked the defendant if he wanted IPI 3.14 and the defendant declined.

¶ 39    "Ordinarily, the failure of a defendant to tender an instruction or to otherwise object at trial waives the issue for appellate review." *People v. Casillas*, 195 Ill. 2d 461, 473 (2000) (citing *People v. Layhew*, 139 Ill. 2d 476, 485 (1990)). However, we do not need to determine whether the issue was properly preserved, nor do we need to determine whether the court should have given the instruction, because we conclude that any error in failing to give IPI 3.14 and in failing to provide the jury with applicable dates for the stalking offenses was harmless.

¶ 40    Our court has held that, because it does not concern the elements of the crime charged, the presumption of innocence, or the burden of proof, a court's failure to instruct the jury regarding the proper and limited use of other-crimes evidence is harmful only if the evidence in the case is closely balanced. See *People v. Campbell*, 2012 IL App (1st) 101249, ¶¶ 32–33; *People v. Jackson*, 357 Ill. App. 3d 313, 321 (2005); *People v. Markiewicz*, 246 Ill. App. 3d 31, 44 (1993). That is not the case here.

¶ 41    The defendant was charged with one count of stalking, one count of aggravated stalking, and two counts of violating an order of protection. In order to prove the offense of stalking, the State was required to show that between July 7, 2020, and May 5 and May 13, 2021, the defendant "knowingly engage[d] in a course of conduct directed at a specific person, and he or she [knew] or should [have known] that this course of conduct would cause a reasonable person to: (2) suffer *** emotional distress." 720 ILCS 5/12-7.3(a)(2) (West 2020). To prove the offense of aggravated stalking, the State needed to prove that between July 7, 2020, and May 5 and May 13, 2021, the defendant violated an order of protection while committing stalking. See *id.* § 12-7.4(a)(3). The evidence related to both of these stalking charges was not closely balanced.

¶ 42    On July 7, 2020, while Guynes' order of protection was in place, the defendant came to Guynes' workplace, a prohibited location under the order of protection. Guynes was in her office and saw on surveillance video that the defendant was ringing the doorbell. Guynes' supervisor spoke to the defendant through the door, and Guynes described the defendant's behavior as "belligerent," with the defendant at one point telling the supervisor "I know she's in there." The defendant finally left after Guynes' supervisor threatened to call the police.

¶ 43    On May 5, 2021, the defendant went to Guynes' home and got into an argument with Guynes and her father. During that argument, the defendant told Guynes that he "didn't want a baby by [Guynes]," that "[Guynes] wasn't going to have this baby," and that "he was going to beat [Guynes'] baby out of [her]." One week later, on May 13, Guynes and the defendant went to the Dan Ryan Woods. The two had a conversation in the defendant's car during which Guynes told the defendant that he could be in the baby's life but not hers. After that, "things got physical." Guynes got out of the car and started to walk home. When Guynes rejected the defendant's apologies, the defendant got out of his car, grabbed her, and tried to force her into his vehicle. Guynes refused and continued walking home. The defendant followed Guynes and yelled at her from his window. Eventually, as Guynes was walking in front of a Baskin Robbins, the defendant got out of his car and started throwing rocks at her.

¶ 44    Based on this testimony, the jury could have found that the defendant knowingly engaged in a course of conduct that he knew or should have known would cause Guynes emotional distress. Given the context of the relationship and the defendant's past conduct, it was clear that the defendant's actions were knowing, and he should have known that acting "belligerent[ly]" at Guynes' place of work, threatening to "beat [Guynes'] baby out of [her]," trying to force her into

his car, and throwing rocks at her while she walked alone on the side of the road would cause Guynes emotional distress. Further, the defendant violated an active order of protection when he engaged in these acts. Accordingly, the evidence supporting the offenses of stalking and aggravated stalking was not closely balanced.

¶ 45     As for the two charges for violating an order of protection, the State was required to show that on May 5 and 13, 2021, the defendant knowingly committed an act that was prohibited by a court in violation of an order of protection. See 720 ILCS 5/12-3.4(a)(1)(i) (West 2020). The order of protection that Guynes obtained on May 29, 2019, forbade the defendant from seeing or contacting Guynes, Guynes' children, or Guynes' father, and from visiting Guynes' home, place of employment, and car. The defendant was present in court when the protection order was entered. Accordingly, the evidence established that the defendant knowingly violated the order of protection when he went to Guynes' home, a prohibited location, on May 5 and saw Guynes, a prohibited contact, on both May 5 and 13. As with the stalking offenses, the evidence on these charges was not closely balanced.

¶ 46     Because the evidence was not closely balanced on any of the four counts against the defendant, any error in failing to instruct the jury on how to use the evidence of the defendant's other crimes was harmless.

¶ 47     Lastly, the defendant asserts that pandemic-related delays in his prosecution that were authorized by the Illinois Supreme Court violated his right to speedy trial. However, the defendant has acknowledged in his reply brief that this argument has been foreclosed by the supreme court's recent decision in *People v. Mayfield*, 2023 IL 128092, in which the court held that its orders

tolling the speedy-trial statute during the COVID-19 pandemic did not violate separation of powers

principles. *Id.* ¶ 3. Accordingly, this argument is without merit and we need not discuss it further.

¶ 48    For the foregoing reasons, we affirm the defendant's convictions.

¶ 49    Affirmed.