NOTICE

Decision filed 07/17/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 200225-UB

NO. 5-20-0225

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 18-CF-295 |
| | ) | |
| MATTHEW SLOAN, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Moore and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse defendant's conviction and remand for a new trial where the circuit court abused its discretion by admitting other-crimes evidence.

¶ 2    Following a jury trial in the Jefferson County circuit court, defendant Matthew Sloan was found guilty of first degree murder and sentenced to 80 years in prison. On direct appeal, defendant raised five claims: (1) the State's evidence was insufficient to sustain his conviction for first degree murder; (2) the trial court erred by denying his request for Illinois Pattern Jury Instructions, Criminal, No. 24-25.09X (4th ed. 2000) (hereinafter IPI 24-25.09X); (3) he was denied a fair trial due to the admission of other-crimes evidence; (4) he was denied a fair trial when the prosecutor made improper statements in opening and closing arguments; and (5) his 80-year sentence was excessive. This court determined that the evidence was sufficient to sustain defendant's conviction

1

for first degree murder but reversed and remanded based on defendant's claim that the trial court erroneously denied his request for IPI 24-25.09X. *People v. Sloan*, 2023 IL App (5th) 200225-U, ¶¶ 77, 80. This court did not resolve defendant's remaining claims on appeal. *Id.* ¶ 80. The Illinois Supreme Court reversed this court's determination of instructional error and remanded to this court for consideration of defendant's remaining claims. *People v. Sloan*, 2024 IL 129676. On remand, we reverse defendant's conviction and remand for a new trial.

¶ 3                                    I. Background

¶ 4      A full recitation of the facts was set forth in this court's prior decision. See *Sloan*, 2023 IL App (5th) 200225-U. We include only those facts necessary to resolve defendant's remaining claims.

¶ 5      The State charged defendant with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2016)) in connection with the shooting death of defendant's brother, David Sloan, on July 4, 2018. The State also charged defendant with one count of aggravated battery with a firearm (*id.* § 12-3.05(e)(1)) and one count of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)).

¶ 6      Prior to trial, defendant asserted the affirmative defenses of self-defense and imperfect self-defense. See *id.* §§ 7-1, 9-2(a)(2). Also prior to trial, the State filed a motion *in limine* seeking to admit evidence of defendant's crimes, wrongs, or other bad acts at trial. Specifically, the State sought to introduce testimony from Daniel Klevorn, defendant's cousin, eliciting that defendant pointed a shotgun at Klevorn in 2004, following a fight. The State alleged that the evidence was admissible to show "*modus operandi*, motive, intent, absence of mistake, and lack of accident."

¶ 7      At a subsequent hearing, the State proffered the following evidence relating to the motion *in limine*. Klevorn and defendant were cousins, and the men knew one another "their entire lives."

2

The State proffered that Klevorn and defendant lived together in Mt. Vernon, Illinois, in 2004. While living together, Klevorn and defendant had "roommate disputes," including disputes about defendant not paying his share of the household bills. Following a night of drinking, an argument ensued between Klevorn and defendant. Defendant appeared with a shotgun "in Mr. Klevorn's face." The State proffered that Klevorn was "a little sketchy on the details of what exactly was in [defendant's] mind in that moment to—to make him get that gun because the fight between them hadn't been" "very remarkable." Klevorn "snatched" the shotgun from defendant's hand. The State proffered that upon being disarmed, defendant went to his bedroom and retrieved a handgun. Before pointing the gun towards Klevorn, Klevorn intervened and disarmed defendant once more.

¶ 8 The State argued that the evidence constituted "evidence of a *modus operandi* of the defendant's motive, of his intent, and of the absence of mistake and lack of accident." First, as to *modus operandi*, the State contended that the 2004 incident constituted "exactly the same set of facts as far as something happening that causes the defendant to retreat to a bedroom and grab a gun." The State further argued that the 2004 incident constituted evidence of defendant's intent to kill his brother "the moment that he got out of that tussle in the front yard and started walking on that beeline for that weapon." The State additionally argued that the evidence constituted "motive and intent" where the "motive [was] simply alcohol." The State argued the evidence was admissible as "absence of mistake and lack of accident." The State asserted that it could not "anticipate everything the defendant might say, but if he argues at all that he didn't intend to pull the trigger, that he only got the gun, you know, didn't intend to use it, then I think it squarely is going to fall into" the motive and intent exceptions.

¶ 9 Defense counsel objected to the admission of the evidence, noting that the evidence lacked reliability where no police report was filed and there was no criminal case arising from the disputed

3

conduct. Defense counsel further noted that 15 years had passed since the 2004 incident and that Klevorn "was a bit sketchy on some of the details." Defense counsel additionally argued that the prejudicial nature of the evidence outweighed the probative value.

¶ 10    After considering the parties' arguments, the trial court ruled:

"It is certainly not to be considered—presented to show propensity to commit a crime, but it can be relevant for all the various factors that have been argued by [the State], namely, the absence of mistake or accident, common plan or scheme, consciousness of guilt, identity, intent, knowledge, *modus operandi*, motive, opportunity, plan or preparation, and giving the complete story, so the Court in its judicial discretion is going to allow this evidence to come in.

I believe that it is relevant and would be presented not to show a propensity to commit crime but showing, certainly, absence of mistake, lack of evidence—of lack of accident, *modus operandi*, possibly motive, possibly intent.

The thing that I note is that Mr. Klevorn's incident was 15 years ago so it's not like this happened the day before or a short time before this, which I think would be a closer call because—to show more propensity, might—might show a propensity, but in this case I don't think that that is the case.

I think it's relevant, particularly if the defendant is—is lodging the affirmative defense of self-defense, and so for clarification to help a jury to get the whole story and the big picture, I think that this incident is relevant, and I will allow it, so I will grant your Motion *in Limine*."

¶ 11    At trial, the State's evidence generally established that defendant shot his brother in the face after the two men spent the day drinking with friends at Klevorn's house. The evidence

4

demonstrated that the two men were involved in a verbal argument in the driveway of defendant's home, the verbal argument escalated into a fistfight that was broken up by defendant's brother's wife, Sara Sloan, defendant went inside his home, defendant's brother followed defendant into the home, and defendant fatally shot his brother inside of the home. Defendant had a blood alcohol concentration of .259.

¶ 12     During opening statements, the State argued that defendant was not acting in self-defense when he shot his brother. The State argued "this isn't the first time that [defendant] has pulled a weapon on a family member."

¶ 13     The State played a recording of the interview police conducted with defendant following the shooting death of defendant's brother. Defendant claimed during the interview that he had an argument with Sara's brother in the car. Defendant denied that his brother was in the car. Defendant claimed he shot Sara's brother after Sara's brother followed him inside after the altercation in the driveway.

¶ 14     Daniel Klevorn, defendant's cousin, testified, *inter alia*, that he previously lived with defendant for approximately eight months in late 2004 or early 2005. Klevorn testified that they stopped living together because defendant "pulled a gun on [Klevorn] one night." Klevorn could not recall the exact date, but he recalled that the two men were drinking beer when the incident occurred. Klevorn did not recall arguing with defendant before defendant pulled the gun on him. The State then stated, "But you mentioned a gun ended up in your face." The State then asked, "How did that happen?" Defense counsel objected on the basis that Klevorn did not testify that "the gun was in his face." The trial court sustained the objection.

¶ 15     When asked to describe the facts and circumstances surrounding the incident, Klevorn responded, "He pulled a gun on me; I took it away from him." Klevorn recalled that "[i]t was a

5

12-gauge shotgun." This happened in the hallway next to the living room. Klevorn then followed defendant into defendant's bedroom, where defendant had another gun. Klevorn took the second gun away from defendant. Klevorn explained that he disarmed defendant "before [defendant] could do much."

¶ 16    On cross-examination, Klevorn denied that "anything" happened that led to defendant pulling the gun on him. Klevorn testified that he did not call the police at the time and later clarified that he first reported the 2004 incident following the July 2018 shooting incident.

¶ 17    Defendant later testified about the incident wherein he pointed a gun at Klevorn. Defendant testified that he and Klevorn "kind of had some hostile words with each other," so defendant grabbed an unloaded gun from his bedroom. Defendant testified that Klevorn took the gun from defendant. Defendant testified that he then went into his bedroom and placed a different gun in his mouth, because he planned to kill himself. According to defendant, Klevorn came into the bedroom, tackled defendant, and took the gun away.

¶ 18    Defendant also testified that he originally did not believe his brother was in the car when Sara picked him up on July 4, 2018. Defendant instead believed the man in the car was Sara's brother. At the time of trial, however, defendant knew that it was his brother in the car. Defendant testified that the verbal argument with the man in the car escalated into a fistfight when they arrived to his home. Sara broke up the fistfight after 30 seconds or a minute. Defendant retreated into the bedroom of his home but heard a door slam and footsteps coming in his direction. Defendant twice yelled, "Get the fuck out." Defendant knew the man had access to guns in Sara's car. When the man appeared in the doorway to defendant's bedroom and advanced towards defendant, defendant shot him. Defendant believed the man planned to "keep this fight going." Defendant claimed he was "[t]ired of being bullied [his] whole life."

¶ 19    During closing arguments, defense counsel asserted that defendant acted in self-defense when he shot his brother. Defense counsel argued that the evidence demonstrated that defendant's brother had access to firearms, came into defendant's home uninvited, and advanced towards defendant after being told to leave.

¶ 20    In rebuttal, the State discussed Klevorn's testimony about the 2004 incident. Defense counsel objected, arguing that discussion of the 2004 incident went beyond the scope of his own argument. The trial court overruled the objection. The State continued: "I'm sure they don't want me to mention again what Daniel Klevorn said because what Daniel Klevorn said is that this defendant has a history of taking a gun and putting it in family members' faces." The State also posed the following question and answer: "Why was [defendant] going to the bedroom? That's where the gun was, just like in 2004 when he went to get the second gun out of the bedroom." The State indicated that the evidence relating to the 2004 incident spoke to defendant's intent and motive.

¶ 21    The jury received the following instruction prior to deliberations:

> "Evidence has been received that the defendant has been involved in conduct other than that charged in the indictment.
>
> This evidence has been received on the issue of the defendant's *modus operandi*, motive, intent, absence of mistake, or lack of accident and may be considered by you only for that limited purpose.
>
> It is for you to determine whether the defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issue of *modus operandi*, motive, intent, absence of mistake, or lack of accident."

¶ 22 Following deliberations, the jury returned a verdict of guilty of first degree murder. Defendant subsequently filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Defendant argued, *inter alia*, that the trial court erred by allowing Klevorn to testify about events that allegedly occurred in 2004. The trial court subsequently ruled that Klevorn's testimony regarding the shooting incident 14 years prior to the trial was "appropriately admitted." The court also noted that the evidence did not support a reasonable defense of self-defense. As such, the court denied defendant's motion.

¶ 23 Following a hearing, the trial court sentenced defendant to 80 years in prison for the offense of first degree murder. Specifically, the court sentenced defendant to 50 years for first degree murder with a 30-year firearm enhancement and 3 years of mandatory supervised release. Defendant filed a motion to reconsider sentence, arguing that the trial court did not make specific findings with regard to mitigation. Following a hearing and argument from the parties, the court denied the motion. Defendant appealed.

¶ 24 On direct appeal, this court determined that the evidence was sufficient to sustain defendant's conviction for first degree murder but reversed and remanded based on defendant's claim that the trial court erroneously denied his request for IPI 24-25.09X. This court did not address defendant's remaining claims. The Illinois Supreme Court reversed this court's determination of instructional error and remanded to this court for consideration of defendant's remaining claims. *Sloan*, 2024 IL 129676.

¶ 25                                    II. Analysis

¶ 26 Defendant's remaining claims include the following: (1) he was denied a fair trial due to the admission of other-crimes evidence, (2) he was denied a fair trial when the prosecutor made

8

improper statements in opening and closing arguments, and (3) his 80-year sentence was excessive. We begin by considering defendant's claim regarding the other-crimes evidence.

¶ 27    Defendant contends that the trial court erred by admitting Klevorn's testimony regarding the 2004 incident wherein defendant allegedly pointed a gun at Klevorn. Specifically, defendant argues that he was denied a fair trial where the jury heard other-crimes evidence concerning a 14-year-old incident that was irrelevant to the charged offense, where the trial court failed to conduct the required balancing test for admitting the other-crimes evidence, and where the State used the other-crimes evidence to show propensity. The State responds that the other-crimes evidence was properly admitted at trial and that its probative value was not outweighed by undue prejudice. The State alternatively argues that any error in the court's admission of the evidence was harmless.

¶ 28    "Evidence of crimes for which a defendant is not on trial is inadmissible if relevant merely to establish the defendant's disposition or propensity to commit crime." *People v. Manning*, 182 Ill. 2d 193, 213 (1998). Such evidence "is objectionable not because it has little probative value, but rather because it has too much," and "overpersuades a jury, which might convict the defendant only because it feels that defendant is a bad person who deserves punishment." *Id.* at 213-14. Our supreme court has reasoned that "[t]he law distrusts the inference that because a person has committed other crimes, he or she is more likely to have committed the current crime. 'And so, as a matter of policy, where the testimony has no value beyond that inference, it is excluded.' " *Id.* at 214 (quoting *People v. Lehman*, 5 Ill. 2d 337, 342 (1955)). However, a trial court may admit other-crimes evidence if such evidence is relevant for any purpose other than to show a defendant's propensity to commit crimes. *People v. Wilson*, 214 Ill. 2d 127, 135 (2005). Specifically, other-crimes evidence is admissible to demonstrate *modus operandi*, intent, motive, identity, or absence of mistake. *People v. Pikes*, 2013 IL 115171, ¶ 11.

9

¶ 29    Even if the other-crimes evidence is offered for one of these permissible purposes, "[t]he [trial court] must weigh the probative value of the evidence against its prejudicial effect, and may exclude the evidence if its prejudicial effect substantially outweighs its probative value." *People v. Moss*, 205 Ill. 2d 139, 156 (2001). The evidence must have some threshold of similarity to the charged crime to be admissible. *People v. Donoho*, 204 Ill. 2d 159, 184 (2003). General areas of similarity are usually sufficient for the admission of other-crimes evidence. *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 36. The more factually similar, the more relevant or probative the other-crimes evidence becomes. *People v. Bartall*, 98 Ill. 2d 294, 310 (1983). After the trial court finds some relevance in the other-crimes evidence, the court must conduct a balancing test to determine whether its probative value substantially outweighs its prejudicial effect. *Pikes*, 2013 IL 115171, ¶ 11. "Whether the probative value of other-crimes evidence is outweighed by its prejudicial impact is a determination left to the trial court's discretion, and we will not disturb that decision absent a clear abuse of discretion." *People v. Spyres*, 359 Ill. App. 3d 1108, 1114 (2005). An abuse of discretion is found where the trial judge's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial judge's view. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 30    Here, the trial court admitted Klevorn's testimony regarding the 2004 incident to show *modus operandi*, intent, motive, and absence of mistake. Thus, we consider whether the court abused its discretion by admitting the evidence under each exception.

¶ 31                        A. *Modus Operandi*

¶ 32    "Prior crimes admitted under the *modus operandi* exception are viewed as circumstantial evidence of identity because crimes committed in a similar manner suggest a common offender 'and strengthen the identification of the defendant.' " *People v. Moore*, 2023 IL (1st) 211421, ¶ 94

10

(quoting *People v. Shief*, 312 Ill. App. 3d 673, 681 (2000)). "Where such evidence is offered to prove *modus operandi*, 'there must be a high degree of similarity between the facts of the crime charged and the other offenses in which the defendant was involved.' " *Shief*, 312 Ill. App. 3d at 681 (quoting *People v. Illgen*, 145 Ill. 2d 353, 372-73 (1991)). This is "because proving identity under a theory of *modus operandi* involves reliance on an inference that a distinctive pattern of criminal activity earmarks the crimes as the work of a particular individual." *People v. Robinson*, 167 Ill. 2d 53, 65 (1995). Even where a particular distinctive feature is lacking, "a sufficient number of common features can form a distinctive combination sufficient to establish the existence of *modus operandi*." *People v. Hansen*, 313 Ill. App. 3d 491, 506 (2000).

¶ 33    The *modus operandi* exception has been explained as follows:

"Most gas station armed robberies involve the use of a pistol to relieve an attendant of all the money in the cash register. Evidence of a series of gas station robberies committed by a masked man who, while armed with a pistol, forces attendants to empty their cash registers would not qualify for admission in order to show *modus operandi*, even though every armed robbery was committed in identical fashion. There would be no distinctive features to the methodology uncommon to most gas station holdups. However, if this same armed robber repeatedly demanded all of the Fritos that the station had on hand, instead of its cash, the robberies would take on a distinctive feature to suggest that they were the work of the same individual. Authorities would know that they were dealing with the Frito Bandito, and upon his arrest, the prosecution would be armed with all the robberies to prove his identity in the crime charged." *People v. Wilson*, 343 Ill. App. 3d 742, 756 (2003) (Kuehn, J., dissenting).

11

¶ 34    Here, there were insufficient similarities between the 2004 incident and the 2018 shooting to warrant admission of the evidence under the *modus operandi* exception. Klevorn's trial testimony regarding the 2004 incident demonstrated that defendant pulled a gun on Klevorn for an unknown reason after a night of drinking at a home defendant shared with Klevorn. Klevorn then disarmed defendant and defendant retrieved another gun from his bedroom. Klevorn again quickly disarmed defendant before defendant could point the gun at Klevorn. In contrast, the evidence surrounding the 2018 shooting indicated that defendant shot his brother following both a verbal argument and physical altercation at the home defendant shared with his parents.

¶ 35    We acknowledge that both the 2004 incident and 2018 shooting involved family members, alcohol, and guns. In our view, however, this is where the similarities end. The 2018 shooting resulted in the murder of defendant's brother, whereas the 2004 incident allegedly resulted in defendant's cousin twice disarming defendant of a gun. The 2018 shooting proceeded a verbal and physical altercation between defendant and his brother, whereas Klevorn did not recall any type of verbal or physical altercation occurring prior to defendant's act of pulling a gun on him in 2004. The 2004 incident and the 2018 shooting involved different victims and occurred in different locations nearly 14 years apart. Simply put, there were no distinctive features between the 2004 incident and the 2018 shooting. Instead, there were several general similarities that are common to most offenses of the same type. Thus, we conclude that the trial court abused its discretion by admitting Klevorn's testimony under the *modus operandi* exception.

¶ 36                                    B. Motive

¶ 37    "The motive exception to the general ban on other-crimes evidence arises in the context of other crimes that serve as the motive behind the crime charged." *People v. Lenley*, 345 Ill. App. 3d 399, 407 (2003). The motive exception has been explained as follows:

12

"The defendant stands trial for first degree murder. The deceased victim of this homicide was scheduled to testify against the defendant at his approaching trial on another pending murder charge. The State may properly introduce its evidence that the defendant committed the earlier murder, in order to establish the motive for the murder for which he stands trial." *Id.*

¶ 38     Here, there was simply no evidence demonstrating that the 2004 incident involving Klevorn provided a motive for the murder of defendant's brother in 2018. Consequently, the other-crimes evidence, here, did not qualify as evidence of motive and, thus, to the extent the trial court admitted it for that purpose, it abused its discretion.

¶ 39                                C. Lack of Mistake

¶ 40     "The admission of other-crimes evidence to show an absence of mistake on a defendant's part arises when the defendant claims that his otherwise criminal acts were the result of a mistake." *Id.* at 408-09. This court explained that the lack of mistake exception would apply in a situation where a defendant accused of burglary claimed he entered the property with the owner's permission and took items with the owner's permission. *Id.* at 409.

¶ 41     Here, the lack of mistake exception does not apply where defendant did not claim that he mistakenly shot his brother.[1] Instead, defendant claimed that he shot his brother in self-defense following the altercation in the driveway. Thus, this case did not involve a claim of mistake and to the extent the trial court admitted it for that purpose, it abused its discretion.

---

[1]We acknowledge that in defendant's police recorded interview and his trial testimony, defendant offered conflicting versions of events. Specifically, defendant indicated that at first, he was under a mistaken belief an unknown intruder entered the home. Defendant testified that he pulled the trigger, because "there was a man in my house that had access to a carload of guns that I didn't recognize, and as far as I was concerned, the fight was over. He didn't think so. He came into the house, and I defended myself." Defendant testified that he was under a mistaken impression that it was Sara's brother who entered the house—who he had never met. We note, however, that the State does not argue this testimony was sufficient to warrant admission of the evidence under the lack of mistake exception.

¶ 42                                   D. Intent

¶ 43    "The intent exception to the general ban on other-crimes evidence arises in the context of defenses that challenge the intent, or the state of mind, with which the defendant commits some act." *Id.* at 407. This court concluded that it is error to allow other-crimes evidence to show intent if a defendant has not placed intent into question. *Id.* We acknowledge that other courts have disagreed and have held that other-crimes evidence is admissible to show intent even if a defendant has not placed intent at issue. See, *e.g.*, *People v. Davis*, 2019 IL App (1st) 160408, ¶¶ 57-69.

¶ 44    Here, the intent exception does not apply where defendant did not claim that he did not intend to shoot his brother. Defendant, instead, acknowledged that he intended to shoot his brother but claimed that he did so in self-defense. As such, defendant did not place intent in question, as required by the intent exception. Accordingly, to the extent the trial court admitted the evidence under this exception, it abused its discretion.

¶ 45    Therefore, we conclude that the other-crimes evidence did not qualify as evidence of *modus operandi*, motive, lack of mistake, or intent. Consequently, we fail to see how defendant's act of pointing a gun at Klevorn was relevant to his act of shooting and killing his brother other than to show defendant's propensity to commit crimes.

¶ 46                                E. Balancing Test

¶ 47    Moreover, as this court previously noted, the record is unclear as to whether the trial court engaged in a proper balancing test, particularly where the court never expressly considered the prejudicial effect of the other-crimes evidence. We note that no criminal charges were brought against defendant in connection with the 2004 incident involving Klevorn. We also note that the incident occurred nearly 14 years prior to the murder at issue in the present case. While the court expressly found the other-crimes evidence was probative, it failed to address the issue of prejudice.

14

To the extent the court failed to consider the prejudicial effect of the other-crimes evidence, the court erred. This error was compounded by the fact that the State's proffer—the basis on which the court allowed the evidence—differed from Klevorn's actual trial testimony. Notably, the State proffered that defendant pointed a gun at Klevorn's face following a verbal argument. However, Klevorn testified that defendant pulled a gun on him for an unknown reason. Klevorn never testified that defendant pointed a gun in his face. The State further compounded this error by stating in opening statements and rebuttal that defendant had a history of pointing guns in family members' faces. In our view, the other-crimes evidence was substantially prejudicial where it served merely to show the defendant was a bad person with a propensity for pointing guns at his family members. Thus, for this additional reason, the court abused its discretion by admitting the other-crimes evidence at trial.

¶ 48                                  F. Harmless Error

¶ 49    We also disagree with the State that the error in admitting the other-crimes evidence was harmless. Whereas here, the error is properly preserved, this court must determine whether the error was harmless. *People v. Johnson*, 238 Ill. 2d 478, 488 (2010). "The improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial because of its admission." *People v. Sims*, 2019 IL App (3d) 170417, ¶ 30. "An error in admitting other-crimes evidence is harmless if there is substantial evidence of the defendant's guilt." *Id.* "[T]he evidence must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different." *People v. Hall*, 194 Ill. 2d 305, 339 (2000). "The State bears the burden of persuasion to prove beyond a reasonable doubt that the result would have been the same without the error. *People v. Herron*, 215 Ill. 2d 167 (2005)." *People v. Quintero*, 394 Ill. App. 3d 716, 728 (2009).

15

¶ 50    Contrary to the State's assertion, the evidence in this case on the issue of self-defense was not overwhelming. The trial evidence demonstrated that defendant called 911 immediately following the 2018 shooting and advised that he shot a person who entered his home without permission. Defendant also maintained, in both his trial testimony and the statements he made to police, that he was acting in self-defense when he fired the fatal shot. The evidence further demonstrated that defendant was aware there were firearms in Sara's car, and that the person who entered defendant's home shortly before the shooting had access to those firearms. This evidence could have supported a finding that defendant acted with the unreasonable belief that self-defense was necessary. In our view, the erroneous admission of the other-crimes evidence could have materially affected the jury's determination on the issue of self-defense. That is, the other-crimes evidence could have overpersuaded the jury into believing that defendant was a bad person who deserved punishment.

¶ 51    We acknowledge that the jury in the present case was presented with a limiting instruction. However, as this court observed in *Lenley*, because "we presume that jurors take direction from limiting instructions and consider evidence only in a manner in which they are told to consider it, the instruction on the use of other-crimes evidence, if given, needs to be accurate." 345 Ill. App. 3d at 411. As we added, "[w]hen jurors are told to consider this kind of evidence for intent, motive, design, and lack of mistake and the evidence has no bearing on those matters, jurors have no way to use the evidence in an appropriate limited manner." *Id.* Given our conclusion that the other-crimes evidence was not properly admitted under these exceptions, we cannot say that the jury instruction cured the erroneous admission of other-crimes evidence in this case.

¶ 52　Therefore, we conclude that the State has failed to demonstrate that the erroneous admission of other-crimes evidence was harmless. In light of our resolution of this issue, we need not address defendant's remaining contentions on appeal.

¶ 53　　　　　　　　　　　　　　III. Conclusion

¶ 54　For the foregoing reasons, we reverse defendant's conviction for first degree murder and remand the cause for a new trial.

¶ 55　Reversed and remanded.