NOTICE

Decision filed 03/03/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240377-U

NO. 5-24-0377

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Franklin County. |
| | ) | |
| v. | ) | No. 21-CF-136 |
| | ) | |
| ALLEN M. FARRIS, | ) | Honorable |
| | ) | Thomas J. Tedeschi, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.*

**ORDER**

¶ 1     *Held*:   The defendant has not demonstrated ineffective assistance of counsel. The evidence was not closely balanced to warrant plain error review regarding the admission of other crimes evidence.

¶ 2     After a jury trial, the defendant, Allen M. Farris, was convicted of four counts of predatory criminal sexual assault of a child and one count of aggravated criminal sexual assault. He was sentenced to a total of 112 years in the Illinois Department of Corrections (IDOC) and a 3-year-to-life term of mandatory supervised release. The defendant appeals these convictions claiming that defense counsel was ineffective and that the circuit court erred in admitting a statement of other crimes evidence. For the following reasons, we affirm the judgment.

_____

*Justice Moore fully participated in the decision prior to his retirement. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6 (1992).

1

¶ 3                                    I. BACKGROUND

¶ 4    On April 14, 2021, the defendant was charged, by information, with four counts of predatory criminal sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2020)) of a child, D.F. (born on December 14, 2010), and one count of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(1) (West 2020)). In count I, the State alleged that on or about November of 2020, the defendant's finger contacted the vagina of D.F. In count II, the State alleged that in between November of 2020, and February 24, 2021, the defendant committed an act of sexual penetration by placing his penis into the vagina of D.F. The State alleged in count III that between November of 2020, and February 24, 2021, the defendant's mouth contacted the vagina of D.F. In count IV, the State alleged that on or about February 24, 2021, the defendant placed his penis in the vagina of D.F. And finally, in count V, the State alleged that on or about February 24, 2021, the defendant placed his penis into the vagina of D.F., a family member under 18 years old, while displaying a dangerous weapon, a knife.

¶ 5    The jury trial began on August 8, 2023. After the jury was selected, opening statements were made by counsel for the parties. D.F. then testified for the State.

¶ 6    D.F. stated that she was 12 years old on the trial date and lived with her aunt and uncle. D.F. had previously lived with her father and Amy Williams (Grandma Amy), her paternal grandmother. D.F. identified the defendant in the courtroom as her father. D.F. testified that when she lived with her father, he touched her "private" more than once with "his hands" and "his private." D.F. told her mother, and Grandma Amy took D.F. to the hospital.

¶ 7    On cross-examination, defense counsel questioned D.F. on whether she made false claims in the past against other people for inappropriately touching her. D.F. testified that she had accused

2

"T.J.," her mother's ex-boyfriend, and had also accused her great-grandfather of inappropriate touching. D.F. admitted to being dishonest about her previous allegations.

¶ 8     On redirect, the State asked if the statements she made about her father in court were true. D.F. testified that she was telling the truth about her father.

¶ 9     Debra Farrell testified that she was D.F.'s maternal grandmother (Grandma Debra). D.F.'s mother lived with Grandma Debra. From November of 2020 through February of 2021, D.F. lived with Grandma Amy. During that time period, Grandma Debra saw D.F. approximately four days a week. Grandma Debra testified that when D.F. was 10 years old, D.F. told Grandma Debra that "she was having problems with her female area. And it was itching and sore and she was having discharge." Grandma Debra informed Grandma Amy about the issue.

¶ 10     Grandma Debra additionally testified that in February, approximately two years before the trial, she was told by D.F. that, "I got my cherry popped." Grandma Debra asked D.F. if she knew what that meant. D.F. explained that "[i]t means when a man puts his penis in your vagina and makes you bleed and pops your cherry." Grandma Debra asked D.F. to explain why she was making that statement and D.F. responded, "that's what my dad did." Grandma Debra told her daughter and other family members, and she made a report to the Illinois State Police.

¶ 11     On cross-examination, Grandma Debra testified that D.F. never told her that she had been molested by other men. Grandma Debra also testified that D.F. was not dishonest.

¶ 12     Don Moody testified that he was in a relationship with Grandma Debra. From November of 2020 to February of 2021, Don would spend time with D.F. "every other weekend or so." Don was also familiar with the defendant. D.F. had confided in Don that the defendant had "been touching her like someone else had." Don asked D.F. what she meant by that and D.F. stated that

3

"her dad popped her cherry, that that was what he told her, and it would be okay." Don told Grandma Debra about D.F.'s statement.

¶ 13    On cross-examination, Don testified that when D.F. was five or six years old, she had lived with her mother for a short time. Don believed that "D.J." was the name of the other person that D.F. accused of having touched her inappropriately.

¶ 14    Justin Haney, a special agent with the Illinois State Police, testified that he investigated the allegations related to D.F., a 10-year-old female, who was allegedly sexually assaulted by a family member. D.F. was evaluated on March 4, 2021, at the Herrin Hospital, and photographs were taken. Haney also scheduled a forensic interview of D.F. with the Child Advocacy Center (CAC). The interview of D.F. by the CAC was conducted on March 9, 2021. Haney did not perform the interview but could hear D.F. giving her statement.

¶ 15    Haney stated that he interviewed the defendant on March 9, 2021, at the Franklin County jail. The defendant told Haney to "come back with some evidence." During the interview the defendant identified himself as "Nebulous," "Omega," and "Sinister." Haney had asked the defendant about his relationship with D.F., and the defendant described two different versions of their relationship. In the first version, the defendant described having "fond memories with each other, doing father/daughter activities." The defendant described a second version where D.F. was "an evil being that's out to get him and it's not his daughter."

¶ 16    The defendant's interview with Haney was audio and video recorded. During the interview the defendant referred to a prior conviction, and the parties agreed to redact any reference to his prior crime. Therefore, a redacted recording of the defendant's interview was published to the jury and admitted into evidence.

4

¶ 17    Haney additionally testified that he was present for a crime scene investigation conducted by the Illinois State Police crime scene investigator, Todd Kuczynski. Five pairs of children's underwear, sex toys, and D.F.'s bedding were collected at the defendant's residence. Based on the CAC interview, the investigators believed that a sex toy may have been used during one of the assaults on D.F. The items that were collected were sent to a forensic laboratory for processing. A buccal swab[1] was used to collect deoxyribonucleic acid (DNA) from D.F. and the defendant.

¶ 18    On cross-examination, defense counsel questioned Haney regarding the defendant's law enforcement interview. Haney testified that he did not recall whether the defendant stated that he was on medication at the time of the interview. The defendant had, however, mentioned that he was not sleeping well because he was not taking his Adderall. The defendant had also informed Haney that after his arrest, he was able to sleep.

¶ 19    Samantha Shoemake testified that she was employed in the emergency department at SIH Herrin Hospital as a sexual assault nurse examiner (SANE nurse). On March 4, 2021, Shoemake conducted an examination of D.F. Shoemake noted that D.F. had a sprained finger and a scratch on her left shoulder. During the examination, Shoemake photographed the genital area of D.F. Upon review of the photographs, Shoemake found that D.F. had injuries to her genital area. Shoemake described the injuries as:

> "She [(D.F.)] did have a laceration from like on top of her mons down. She did have two tears on each side of her labia, yes, one on the right and one on the left. And then there were some discolorations on top of the mons, and then a small discoloration on her buttock."

Shoemake additionally testified that it was possible that D.F.'s injuries could have been caused by something other than sexual assault.

---

[1]Haney explained that a buccal swab is the collection of DNA from inside a person's cheek using a cotton swab.

¶ 20    Kathy Swafford, a physician with extensive experience in pediatric medicine, testified that on March 10, 2021, she performed a physical examination on D.F. Dr. Swafford indicated she was board certified in pediatrics and child abuse pediatrics and was further qualified as an expert in the field of pediatrics. According to Swafford, the genital exam of D.F. was "remarkable for a laceration on what we call the mons pubis, met from just at the base of the clitoris vertically upward about a centimeter-and-a-half." Swafford opined that D.F. was the victim of physical abuse because of her injured finger and "trauma to the genital tract."

¶ 21    Keia Tate with the Illinois State Police Forensic Crime Lab was qualified as an expert witness in the field of biology and forensic testing. Tate indicated that she tested five pairs of D.F.'s underwear for semen. Biological stains were found on the underwear which she tested, and semen was found on three of the pairs of underwear. No sperm was found. Tate also swabbed the sex toy for DNA. Tate prepared samples for further evaluation and Jennifer Mulrean completed the DNA testing.

¶ 22    Jennifer Mulrean, a forensic scientist in the biology and DNA section of the Metro-East Forensic Science Laboratory, was acknowledged as an expert in her field. Mulrean testified that she conducted the DNA analysis on the prepared samples. She indicated that a pair of "blueish-greenish underwear" had DNA of a female profile that included D.F., and a major male profile that included the defendant. Semen was found on other pairs of underwear which were tested for DNA, but there was insufficient male DNA present to render an opinion regarding who might be included in that profile. She also conducted a DNA test on a sex toy that included female DNA where D.F. was included with a statistical frequency of 1 in 190 octillion. Mulrean explained that when considering these statistical frequencies, "[t]he higher the number the more rare the profile

6

is." She further explained that "an octillion is 1 with 27 zeros following it." The minor DNA profile on the sex toy where the defendant was included, had a statistical frequency of only 1 in 2.

¶ 23    Hilary Chandler testified that she was employed through the CAC and conducted a forensic interview of D.F., which was recorded. Chandler testified that during the interview, D.F. disclosed abuse by the defendant and described several different types of sexual abuse. The CAC video interview was published to the jury and admitted into evidence, without objection. Chandler's handwritten notes from the interview, a female body chart where D.F. acknowledged her private part, and a male body chart where D.F. identified a male body part were also admitted into evidence, without objection.

¶ 24    The video depicted D.F. in the CAC interview room. Initially, D.F. stated that she did not want to talk about what had happened. D.F. then stated that the defendant had touched her and then said it was hard to describe. She continued by explaining that the first time that the defendant had touched her private, they were sitting on a couch. D.F. tried to push him off but was not able to do so. Chandler showed D.F. a drawing and D.F. pointed to the private part on the image. D.F. said that the defendant touched the inside of her private parts with his hands. The defendant had removed her pants. D.F. then told Chandler that she was worried that her family members did not believe her. Chandler acknowledged that these things were difficult to talk about and gave D.F. a basket of fidget toys so she could hold something while they talked. Chandler then asked D.F. additional questions about the incident with defendant on the couch. D.F. explained that after the defendant stopped touching her, she "cleaned herself up" in the bathroom and felt liked going to bed.

¶ 25    D.F. described another incident where the defendant put D.F. in the bedroom and took off D.F.'s clothes. The defendant was not wearing underwear. D.F. explained that the defendant put

7

his private in her and it hurt. She started to cry and the defendant put his hand over her mouth. D.F. also described that "it felt wet after he did it, there was something on me and I did not know what it was." She wiped the "clear-ish white-ish wetness" off her privates in the bathroom and then showered.

¶ 26    D.F. described additional incidents. The defendant had touched her private area with his mouth. The defendant had told her to "shush" and put his private in her private. The same "stuff" was on her again. The defendant had touched D.F. while they were in the living room watching television, and he took her into the bedroom. The defendant slapped D.F. in the face and D.F. was scared. The defendant's private spot was in her private area and she bled. D.F. said that "stuff came out, the clear-ish white stuff." The defendant had also grabbed a knife at some point. D.F. explained that the defendant had tapped D.F. on the knee while D.F. was asleep on the couch. The defendant also threatened to break D.F.'s phone. D.F. had blood on her shoulder from the knife.

¶ 27    D.F. additionally told Chandler about how she reported these acts of touching to her mother. D.F. did not want her mother to tell Grandma Amy. D.F. was worried that she would not be able to see Grandma Amy anymore if she found out about the defendant. D.F.'s mother eventually told family members, and her Grandma Amy was told about the defendant's actions. D.F. then told Chandler that "I was right" because she did not get to see them again.

¶ 28    The CAC interview additionally included D.F. informing Chandler that when D.F. was three years old, her mother's boyfriend had touched her. D.F. saw a counselor after the incident because she had been hurting animals. D.F. also stated that she wanted the defendant to go to prison, and that the defendant had been in jail before for touching a 16-year-old girl. D.F. believed that one of her grandmothers told her about the defendant being in jail before. D.F. then stated that

8

she did not know how old the girl was that the defendant had touched, and she could not remember who gave her that information.

¶ 29   On cross-examination, defense counsel asked Chandler a series of questions regarding D.F.'s credibility. The following transpired:

> "Q. And I think I heard you say you did believe her?
> A. Yes.
> Q. Okay. And so is that based on your training and experience, that you believe her mannerisms and disposition, that she gave you some indication that she was telling the truth?
> A. Yes.
> Q. Okay. And so when she said that Mr. Farris, in November of 2020, there was contact between his finger and her vagina, you believed that?
> A. Yes, I did.
> Q. Based on your training and experience?
> A. Yes.
> Q. Okay. The same for Mr. Farris placing his penis into the vagina, her vagina, between November 2020 and February 24th, 2021?
> A. Yes.
> Q. The same for between November 2020 and February 2024 [*sic*], contact between the defendant's mouth and [D.F.'s] vagina?
> A. Yes.
> Q. Interrupting here, the statement she made about mom's boyfriend abusing her at some point earlier?
> A. Uh-huh.
> Q. You believe that as well?
> A. Yes.
> Q. The—that on February 24th, for the purpose of sexual gratification, the defendant placed his penis into her vagina, you believe that?
> A. Yes.
> Q. And then that while doing so he also brandished a dangerous weapon?
> A. Yes.
> Q. Okay. So all of those things, based on your training and experience, you believe she was telling the truth?
> A. Yes, I do.
> Q. Okay. And if she wasn't do you believe that she's a pretty convincing liar?
> A. No, I don't.
> Q. Well, if you don't think she's good at lying why would you believe everything is the truth? I'm saying if we found out one of those wasn't true.
> A. Because I truly believe that she was telling the truth the entire time she was in there.
> Q. Okay.

9

A. I don't have any reason to believe any of that was a lie.
Q. What if she said something that was a lie?
A. Then I guess I'm wrong."

¶ 30    The State rested after Chandler's testimony concluded. The defense moved for a directed verdict, and the circuit court denied the motion. The defendant invoked his right to remain silent and did not testify.

¶ 31    Grandma Amy, D.F.'s paternal grandmother, testified for the defense. Grandma Amy testified that D.F. was living with her in February 2021. She indicated that the sex toys in the home belonged to her, and that she washed D.F.'s clothes once a week. On the day that the crime scene investigators were at her home, D.F. was still living with Grandma Amy. The defense rested after Grandma Amy testified.

¶ 32    After closing arguments, the jury deliberated. The defendant was found guilty on all five counts charged.

¶ 33    The defendant was sentenced to four consecutive sentences of 28 years in the IDOC for counts I through IV for a total of 112 years. Count V merged with count IV. This appeal followed.

¶ 34                                    II. ANALYSIS

¶ 35    On appeal, the defendant argues that defense counsel was ineffective for eliciting an expert opinion from the State's witness regarding D.F.'s credibility. The defendant additionally argues that the circuit court erred when it allowed other crimes evidence regarding defendant's previous incarceration related to sexual abuse of a minor and further argues that defense counsel was ineffective for failing to object to this evidence.

¶ 36    A criminal defendant has a constitutional right to effective assistance of counsel at all critical stages of the criminal proceedings as guaranteed by the sixth amendment. *People v. Brown*, 2017 IL 121681, ¶ 25. Claims of ineffective assistance of counsel are governed by the familiar

two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, ineffective assistance of counsel claims are established where the defendant demonstrates that (1) counsel's performance was deficient and (2) the deficient performance resulted in prejudice. *People v. Hughes*, 2012 IL 112817, ¶ 44. Both prongs of the *Strickland* test must be satisfied. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). We do not need to evaluate whether counsel's performance was deficient if we determine that the defendant cannot show prejudice. *People v. Hale*, 2013 IL 113140, ¶ 17.

¶ 37    "An ineffective-assistance-of-counsel claim which arises from a matter of defense strategy will not support a finding of ineffective representation." *People v. Smith*, 177 Ill. 2d 53, 93 (1997). Mistakes in strategy may not result in ineffective assistance as a defendant is not entitled to perfect representation. *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). The decision to cross-examine or impeach a witness is considered a matter of trial strategy. *Smith*, 177 Ill. 2d at 92.

¶ 38    To demonstrate that the defendant suffered prejudice, "the defendant must show that, 'but for' counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011). Prejudice cannot be proven by mere conjecture or speculation under *Strickland*. *People v. Tuduj*, 2014 IL App (1st) 092536, ¶ 102. The standard of review for determining whether the defendant received ineffective assistance of counsel is *de novo*. *Hale*, 2013 IL 113140, ¶ 15.

¶ 39    The defense presented a theory attacking the credibility of D.F. suggesting she made up stories of sexual abuse. During the CAC interview, D.F. had informed Chandler that D.F. had been touched inappropriately by her mother's boyfriend. At trial, D.F. testified that she had previously accused her mother's ex-boyfriend and her great-grandfather of touching her inappropriately. D.F. admitted that she had been dishonest about her previous allegations of sexual abuse.

11

¶ 40     On cross-examination of Chandler, defense counsel questioned her by eliciting a series of statements identifying D.F.'s allegations of the defendant and then asked whether Chandler believed D.F. Chandler repeatedly opined that she believed D.F. Defense counsel then questioned Chandler regarding whether she believed D.F.'s statements that her mother's boyfriend had abused her. Chandler also believed D.F.'s statement of abuse by mother's boyfriend. D.F., however, had admitted to being dishonest about her previous allegations against mother's boyfriend during cross-examination by defense counsel. We find that defense counsel's cross-examination was trial strategy where defense counsel's line of questioning was designed to address D.F.'s credibility. Thus, defense counsel's performance was not deficient.

¶ 41     Furthermore, the evidence of the defendant's guilt in this case was overwhelming. D.F. clearly testified to specific incidents of sexual abuse by the defendant. The jury was able to assess D.F.'s credibility when she gave her CAC interview and testified at trial. Semen and evidence of the defendant's DNA was identified on D.F.'s underwear and a sex toy was also found to have D.F.'s DNA present on it. Dr. Swafford, an expert in child abuse pediatrics, opined that D.F. was the victim of physical abuse that included "trauma to the genital tract." The defendant has not demonstrated ineffective assistance of counsel where defense counsel's cross-examination was a matter of trial strategy. Further, the defendant cannot establish prejudice where the evidence against the defendant was overwhelming.

¶ 42     We turn to the defendant's argument that the CAC forensic interview included inadmissible other crimes evidence as D.F. alleged the defendant had been incarcerated for improperly touching a 16-year-old. The defendant acknowledges that this issue was not preserved for appeal and seeks plain error review. The defendant additionally argues that defense counsel was ineffective for failing to object to the CAC interview and for failing to have the statement redacted from the video.

12

¶ 43    An issue is forfeited on appeal where the defendant fails to object at trial when allegedly improper evidence is introduced. *People v. Hudson*, 228 Ill. 2d 181, 190 (2008). "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step in plain error analysis is to determine whether an error occurred because without error, there is no plain error. *People v. Wilson*, 2022 IL App (5th) 190377, ¶ 41.

¶ 44    "The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." *People v. Lindgren*, 79 Ill. 2d 129, 140 (1980). If the other crimes evidence is only relevant to establish the defendant's propensity to commit crime, then it is inadmissible. *People v. Manning*, 182 Ill. 2d 193, 213 (1998). Such evidence can be overpersuasive and lead a jury to convict simply because they believe the defendant is a bad person deserving punishment. *Manning*, 182 Ill. 2d at 213-14. The circuit court must weigh the probative value of other crimes evidence against its prejudicial effect and may exclude the evidence if the probative value is substantially outweighed by the prejudicial effect. *Manning*, 182 Ill. 2d at 214.

¶ 45    Other crimes evidence is admissible when the evidence is relevant to establish a material question. *Manning*, 182 Ill. 2d at 214. Evidence of other sex crimes may be admissible for the purpose of propensity under section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2022)), which expressly permits that other crimes evidence can be admitted for any relevant purpose. *People v. Ward*, 2011 IL 108690, ¶ 25. However, the statute requires that

13

the State disclose the evidence prior to trial, and the circuit court must decide, prior to admitting the evidence, whether its probative value outweighs the risk of unfair prejudice. 725 ILCS 5/115-7.3(c), (d) (West 2022). A determination of the admissibility of other crimes evidence will not be reversed on appeal, absent an abuse of discretion. *People v. Chambers*, 2011 IL App (3d) 090949, ¶ 10.

¶ 46 Here, the State did not move to admit the defendant's prior conviction as propensity evidence. We note that the State and defense counsel had entered into an agreement to remove all references to the defendant's prior conviction from the defendant's law enforcement interview. Consequently, we find the admission of the unredacted CAC forensic interview wherein D.F. stated the defendant had been in jail for touching a 16-year-old was error as it allowed the admission of a statement of other crimes evidence.

¶ 47 We limit our focus as to whether the first prong of plain error review applies as the defendant only invoked a request for review under that theory. "[E]rrors reviewable under the first prong of the plain error rule are the type of errors that are subject to harmless error analysis, and a defendant must establish prejudice resulting from the error to excuse his forfeiture of such an error." *People v. Jackson*, 2022 IL 127256, ¶ 23.

¶ 48 As discussed above, the evidence in this case was overwhelming against the defendant. DNA evidence from the defendant's semen was found in D.F.'s underwear. D.F.'s testimony and statements made during the CAC forensic interview were consistent with the opinions rendered by the expert physician in child abuse pediatrics and the SANE nurse. Thus, we find that the first prong of plain error review does not provide a basis for excusing forfeiture of this issue where the evidence was not closely balanced. The defendant has not established prejudice resulting from the

statement that D.F. heard that the defendant may have been previously incarcerated for touching a 16-year-old girl.

¶ 49　The defendant additionally raised an ineffective assistance of counsel claim on this issue where defense counsel failed to object to the other crimes evidence statement and did not seek redaction prior to trial. We reiterate that under *Strickland*, if we determine that the defendant cannot show prejudice, then we do not need to evaluate whether counsel's performance was deficient. *Hale*, 2013 IL 113140, ¶ 17. Again, the evidence of the defendant's guilt was overwhelming in this case. The defendant has not demonstrated that there is a reasonable probability that the result of the proceeding would have been different if D.F.'s statement, referencing the defendant's prior incarceration for touching a 16-year-old, had been redacted. See *Lacy*, 407 Ill. App. 3d at 457. The defendant has not demonstrated the defense counsel was ineffective.

¶ 50　　　　　　　　　　　　　III. CONCLUSION

¶ 51　For the forgoing reasons, we affirm the judgment of the circuit court of Franklin County.

¶ 52　Affirmed.